**NATIONAL LABOR RELATIONS BOARD**
**v. THOMPSON PRODUCTS, Inc.**

No. 9129.

Circuit Court of Appeals, Sixth Circuit.
Aug. 28, 1942.

Max W. Johnstone, of Washington, D. C. (Robert B. Watts, Ernest A. Gross, Gerhard P. Van Arkel, Ruth Weyand, and Robert N. Cook, all of Washington, D. C., on the brief), for petitioners.

Harry E. Smoyer, of Cleveland, Ohio (Stanley & Smoyer, Welles K. Stanley, and Eugene B. Schwartz, all of Cleveland, Ohio, on the brief), for respondent.

M. Alfred Roemisch, of Cleveland, Ohio (Selzer & Roemisch, of Cleveland, Ohio, on the brief), for intervener Automotive & Aircraft Workers Alliance, Inc.

Before SIMONS, ALLEN, and McAL-LISTER, Circuit Judges.

SIMONS, Circuit Judge.

The petitioner seeks a decree enforcing its order of August 1, 1941, that the respondent cease and desist from dominating or interfering with organizations among its employees, withdraw all recognition of and disestablish the Automotive and Air Craft Alliance, Inc., and take certain affirmative action. The respondent resists on the ground that the action of the Board was beyond its jurisdiction, barred by previous proceedings, and its ultimate findings and conclusions erroneous because unsupported by evidence. The Alliance intervenes in support of the challenge to the validity of the Board's order.

The respondent is engaged in the manufacture and sale of automobile parts in Cleveland, Ohio, and elsewhere, though the present proceeding involves only its Cleveland plants. In 1934 it cooperated with its employees in the formation of an organization known as "Thompson Products, Inc., Employees Association." This was an unaffiliated labor organization which, it is now conceded, became unlawful upon passage of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., because representatives of the employer were upon its governing council, and because its basic law recognized restraints upon action by employer representatives. It was therefore a labor organization dominated by the employer within the meaning of § 8(2), and the interference and restraint allowed to the employer by its constitution and its contracts with the respondent, invaded rights guaranteed by § 7 and became unfair labor practices within the meaning of § 8(1).

In March and April of 1937 the United Automobile Workers of America, Local 300, affiliated with the Congress of Industrial Organizations, hereinafter referred to as the Union, became active in an endeavor to organize the respondent's employees. It is clear, upon the record, that the respondent was opposed to this activity. In a number of articles appearing in its factory

newspaper, "Friendly Forum," between March 26th and April 12th, comment was made derogatory of the Union and commendatory of the Association. These included an open letter in the April 9th issue, addressed to all employees and signed by the Association's employee representatives, which observed that "Recent statements made by an outside organization * * * in an effort to invade our plants prompt the candid opinion that no organization can secure any concessions from management that the present Association cannot secure, and with less * * * ill will. * * *"

On April 12, 1937, the Supreme Court, in a series of decisions, upheld the constitutionality of the National Labor Relations Act (N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, and companion cases). Shortly thereafter the respondent posted upon its bulletin boards a notice which undertook to summarize the more important provisions of the Act. It called attention to the creation of the Board to decide questions of representation and to rule on alleged unfair labor practices, but declared the Board to be without enforcement powers, and concluded with the following: "It Should Be Understood That This Bill Has Been a Law for Nearly Two Years and This Company Has Been Observing Its Terms. Therefore, the Supreme Court's Recent Decision Causes No Change Whatsoever in Present Plant Conditions or Relationships."

Notwithstanding these assurances there was a feeling among some of the employee representatives in the Association, that their organization was not within the letter and spirit of the Act, and that some changes should be made in its constitution. They advised with Livingstone, respondent's director of personnel, who agreed that there should be revision, and advised that quick action should be taken because of awareness that the law was being violated. Wright, another officer of the respondent, was also consulted. He advised that incorporation was unnecessary, but that the Association might be improved by certain revisions in the constitution. At a meeting in the office of Crawford, respondent's president, it was suggested that revision should deal only with the purpose of the Association and the rules pertaining to eligibility for membership and election and eligibility of representatives, but that provision for presentation of grievances and relationships with management be left to contract. A committee to study and recommend changes in constitution was appointed. Subsequently certain changes were decided upon and later a revised constitution, purporting to conform to the Labor Act, was adopted.

Apparently there was still some doubt as to the validity of the Association. An independent attorney was consulted who suggested the incorporation of an entirely new organization. This advice was followed and the Alliance was born. Its incorporators and officers were, in the main, the employee delegates, representatives, and committee chairmen of the older organization. Immediately there began a solicitation for memberships among employees of the respondent, and on June 20th, at a joint meeting of the committee of representatives and officers of the new organization, it was reported that the membership committee had received 912 applications for membership, and it was voted to notify the respondent of an intent to seek a contract with it. While the organization of the Alliance and solicitation for members was going forward, the Union had likewise been active, but during this period the "Friendly Forum" continued its derogatory comment upon Union activities, while crediting the Association with substantial increase in employees' wages, and publicizing the Alliance campaign for memberships. In its columns was a statement by Arnold, temporary president of the Alliance, to the effect that it was the only sane method of bargaining collectively because the Alliance was not asking employees to pay high monthly dues, and its nominal dues would not go for salary to officers and organizers.

On June 21st a committee of Alliance officers met with respondent's personnel director in the office of respondent's president, exhibited 833 membership cards which were said to represent a majority of the employees, and requested an exclusive bargaining contract. It was arranged that the signatures should be checked, and when this had been completed, the committee was advised, on June 25th, by Livingstone, that the Alliance had a majority of employees, and that there was no alternative for the company but to grant it exclusive bargaining rights. Between June 25th and 30th the terms of the contract were tentatively agreed upon, and on the latter date, at a meeting in the offices of the attorney for the Alliance, it was voted to accept the

contract and authorize its execution. On July 1st, at a meeting of the Joint Council of the Association, it was agreed that since a new union now represented a substantial majority of the employees, the contract between the respondent and the Association should be terminated. At the suggestion of Livingstone, a resolution was drafted as a testimonial to the achievements of the Association, and an agreement likewise was drafted terminating the Association's contract. On July 2nd, the contract between the respondent and the Alliance was signed, recognizing the Alliance as the exclusive representative of the respondent's Cleveland employees for the purposes of collective bargaining. It provided for the creation of a Labor Relations Committee consisting of an equal number of Alliance and management representatives for the purpose of adjusting grievances. In October, 1938, further contracts were made substantially similar.

The respondent does not assail the evidentiary fact findings of the Board. Its grievance is, in the main, directed to the inferences drawn therefrom and to the Board's ultimate conclusions. Before giving consideration to this challenge, however, it becomes necessary to dispose of contentions alleging jurisdictional infirmity and estoppel. The Board's complaint asserted the Union to be a labor organization within the meaning of § 2(5) of the Act. The respondent answered that it was unable to admit or deny this allegation. This, it now says, put in issue the existence of the Union. Notwithstanding, no evidence was offered to sustain the Board's allegation or its finding in that respect. Inasmuch as the Board has no power to initiate a proceeding on its own motion, but may do so only upon complaint of employees or of a labor organization which includes employees, and since the Board failed to prove existence of the Union, its qualification to file such complaint, or that it was capable of acting as a bargaining representative of the employees, if selected, it is urged that the Board had no jurisdiction and that the whole proceeding must fail.

■ This respondent, however, has been before the Board and before this court before, upon complaint of the same Union. N.L.R.B. v. Thompson Products, Inc., 6 Cir., 97 F.2d 13, 14. There was no contention then that the complaining organization was not bona fide a Union eligible to bring charges or qualified to function as a bargaining unit if selected by a majority of the respondent's employees. In the opinion in the case we said: "United Automobile Workers of America International Union is a national labor organization of approximately 350,000 members, workers in automobile and automobile accessory plants. In June, 1931, it affiliated with the Committee for Industrial Organization. On April 2, 1937, representatives of the Union circulated handbills inviting all employees of the respondent to attend an open meeting in Cleveland, Ohio, to be held on Sunday, April 4, 1937, and about two hundred attended, some of whom were members of an Employees' Association." No complaint was made of this finding. It would be a fantastic exaltation of procedural technicality to ignore facts which judicially we know, or to require proof, upon a mere speculation of unreality, of a condition that for so long has been accepted as established.

The estoppel contention of the respondent is based not only upon the previous proceeding here but upon still another complaint issued by the Board at the instance of the Union on March 8, 1939, subsequent to our decision, and alleging violations of § 8(1), (3) of the Act. The second proceeding was disposed of in October, 1940, by means of a stipulation of settlement. It is now urged that since the existence of the Association and the organization of the Alliance, together with the latter's recognition as an exclusive bargaining agency capable of contracting with the respondent, and the execution of contracts with it, were all circumstances transpiring before the inauguration or during the proceedings upon the previous complaints, known to the complaining Union and the Board, the Board is now barred upon principles of estoppel or by the application of the doctrine of res adjudicata, from considering the charges of the Union or entering the present complaint. The legal question presented is stated thus: "May the same complaining Union split into three charges, and cause to be made into three cases against an employer over a period of more than three years, evidence which could have been included in either the first or second case, or both?"

■ Manifestly, good practice and a spirit of fairness dictates the consolidation of all current grievances into a single complaint, and an employer ought not to be

harassed by repeated charges of invasion of employee rights during a given period of time. We are, however, obliged to bear in mind that a proceeding under the National Labor Relations Act is not litigation between private parties even though the inquisitorial and corrective powers of the Board may not be invoked without a charge being lodged by individual employees or an employee union. It is a proceeding by a public regulatory body in the public interest. It is neither punitive nor compensatory but preventative and remedial in its nature. N.L.R.B. v. Piqua Munising Wood Products Co., 6 Cir., 109 F.2d 552, 557; Consumers Power Co. v. N.L.R.B., 6 Cir., 113 F.2d 38. As we said of orders of the Board in N.L.R.B. v. Colten, 105 F.2d 179, 182, "they are to implement a public social or economic policy not primarily concerned with private rights, and through remedies not only unknown to the common law but often in derogation of it." See, also, Agwilines, Inc., v. N.L.R.B., 5 Cir., 87 F.2d 146, 150 where it was said: "The proceeding is not, it cannot be made a private one to enforce a private right. It is a public procedure, looking only to public ends." It therefore would seem to follow that if the so-called bargaining agency is in any respect brought forth by employer domination or interference, and the contractual relationship with it is a continuing one, the effect is a continuing invasion of employee rights to bargain collectively through agencies of their own choice without interference of any kind by the employer, and the Board is not barred by any principle of estoppel or the doctrine of res adjudicata from putting a stop to it.

Prior to the enactment of the National Labor Relations Act and its adjudication as constitutionally valid, the respondent's employee organization, known as the Association, was undoubtedly dominated by the employer. Its representatives were paid by the respondent for time spent in connection with its affairs; its governing body, the Joint Council, was employer controlled and its expenses by it paid. It was not disestablished until after the Alliance was formed. In the period intermediate between the Jones & Laughlin, decision, and the formation of the Alliance, the respondent undertook to advise and cooperate with its employees in respect to constitutional changes in the organization of the Association which, it was hoped, would validate it under the Act. While the Alliance was being formed, the respondent,

in its publication, condemned the activities of the outside union, extolled the activities of the inside organization, and publicized the efforts of the Alliance in its drive for membership. The Board therefore concluded that the manner in which the Alliance was formed, and the support granted to it by the respondent during the period of its formation, indicated the respondent's desire to retain control of its employee representatives, and that since the originators of the Alliance were officers and leading spirits in the Association, they were, in the eyes of employees, representatives of management. It gave weight to the circumstance that the Association was not abandoned until after the Alliance was established, and to the fact that the respondent had previously, in its bulletin board notice, given emphasis to its view that the Labor Act and its validation made no change whatsoever in existing plant conditions or relationships. The Board was therefore of the opinion that the Alliance was successor to the Association, and that the employees had not possessed the freedom to choose their representatives, that is guaranteed to them by the Act.

The respondent and the intervenor insistently urge, however, that the organization of the Alliance proceeded from the initiative and independent will of the employees, was guided by counsel having no connection with the respondent, and that it consistently dealt with the employer at arm's length. They also greatly stress the fact that though 4,000 persons were employed by respondent at its Cleveland plants at the time of the hearing, not a single employee either in the collective bargaining unit involved, or in the complaining union, testified against the respondent. They insist that there is no evidentiary support for a conclusion that respondent's employees were of the belief that they would win employer approval if they joined the Alliance, or incur displeasure if they refused, though all of them were available as witnesses.

We have been told, in terms beyond the possibility of misunderstanding, and repeatedly, that by the National Labor Relations Act, Congress has entrusted power to draw inferences to the Board and not to the courts. N.L.R.B. v. Falk Corp., 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396; N.L.R. B. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; N.L.R.B. v. Newport News Shipbuilding & Dry Dock Co., 308

U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; N.L.R.B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368. In the Falk case, an inference was held to have been drawn justifiably that a company created union could not emancipate itself from habitual subservience to its creator without being completely disestablished, so as to insure that employees would have complete freedom of choice guaranteed by § 7 of the Act. In the Link-Belt case it was held that the Board had a right to believe that the maintenance of a company union down to the date when another internal union was organized was not a mere coincidence, and that this circumstance made credible the finding that complete freedom of choice on the part of employees was effectively forestalled when there had been a declared hostility to an outside union. In International Association of Machinists v. N.L.R.B., 311 U.S. 72, 78, 61 S.Ct. 83, 88, 85 L.Ed. 50, it was said that "slight suggestions as to the employer's choice between unions may have telling effect among men who know the consequences of incurring that employer's displeasure."

Great stress is laid by the respondent on its neutrality between the outside union and the Alliance. We have examined the record with care and find little evidence of it. Certainly, its continued attacks upon the outside union in its publication give little support to its alleged neutrality, and its assertion that the Act required no change in its employer-employee relations is not the proclamation of a neutral attitude.

In our consideration of the decisions above noted, we are forced to the conclusion that the test, whether a challenged organization is employer controlled, is not an objective one but rather subjective, from the standpoint of employees. As was said in the case of International Association of Machinists v. N.L.R.B., supra, approved in the Link-Belt case, supra [311 U.S. 584, 61 S.Ct. 366, 85 L.Ed. 368], "If the employees 'would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates.'" Given the circumstances heretofore recited, there is room for such inference. Granted that employees were not called by the Board as witnesses to support its inference, the way was equally open to the respondent

to repel it, and the failure of the one bulks no larger than the silence of the other. It is idle to argue that the acts of the respondent were justified because committed during the earlier days of the operation of the Labor Act and before the great body of law now existing had been developed. As already indicated, a Labor Board proceeding is not punitive but remedial and preventative. The purpose of the Act is to secure the right of free choice to employees in the selection of their bargaining agencies, and so circumstances in mitigation of an employer's labor policy are not appropriate subjects for consideration. The employer must keep his hands off, and completely. That is the doctrine of the adjudications binding upon us. We are of the opinion that the Board's order, insofar as it directs the respondent to cease and desist from dominating or interfering with the administration of the Alliance, and from giving effect to any and all contracts with it, must be enforced.

The order must, however, in some other respects, be modified. It is clear that the original company union, the Association, has long since been disestablished and the respondent's contracts with it abrogated. There is no prospect of a resurrection. It has been pointed out that § 10(c) was not intended to give the Board power of punishment or retribution for past wrongs or errors. N.L.R.B. v. Newport News Shipbuilding & Dry Dock Co., supra. As was said in E. I. Du Pont De Nemours and Co. v. N.L.R.B., 4 Cir., 116 F.2d 388, 401: "No useful purpose would be served here by 'whipping the corpse.'" Paragraph 1(a) of the order must be amended by striking therefrom all reference to Thompson Products, Inc., Employees Association.

Paragraph 1(c) of the Board's order must also be eliminated. It directs the respondent to cease and desist from "In any other manner interfering with, restraining or coercing its employees in the exercise of the right to self-organization." It is not supported by evidence. N.L.R.B. v. Express Publishing Co., 312 U.S. 426, 434, 61 S.Ct. 693, 85 L.Ed. 930; N.L.R.B. v. American Rolling Mill Co., 6 Cir., 126 F.2d 38, 42.

We have given no consideration to the contention that the articles in the "Friendly Forum" are protected by the guaranties and immunities of the First Amendment to the Constitution of the Unit-

ed States, N.L.R.B. v. Ford Motor Co., 6 Cir., 114 F.2d 905, since they are untouched by the Board's order. Insofar as they disclose the attitude of the respondent, they may bear upon restraint, even though no power resides in the Board to limit the respondent's constitutionally protected freedom of expression.

The order will be modified in the respects here indicated, and as modified will be enforced by an appropriate decree.