## NATIONAL LABOR RELATIONS BOARD v. CLEVELAND–CLIFFS IRON CO.

### No. 9162.

Circuit Court of Appeals, Sixth Circuit.

Feb. 11, 1943.

---

[1] The reference is to § 548, Tit. 18 U. S.C.A. as it was prior to the amendment of June 28, 1932, c. 284, 47 Stat. 336–337.

Robert T. McKinlay, of Washington, D. C. (Robert B. Watts, Ernest A. Gross, Gerhard P. Van Arkel, Morris P. Glushein, Louis Libbin, and William K. Sherwood, all of Washington, D. C., on the brief), for petitioner.

Luther Day and Earl W. LeFever, both of Cleveland, Ohio (Luther Day, Thomas F. Veach, Earl W. LeFever, and Jones, Day, Cockley & Reavis, all of Cleveland, Ohio, on the brief), for respondent.

Before SIMONS, HAMILTON, and McALLISTER, Circuit Judges.

SIMONS, Circuit Judge.

The petitioner, in pursuance of §10(c) of the National Labor Relations Act, 29 U.S.C.A. § 160(c), having found the respondent to have engaged in unfair labor practices in violation of §§ 8(1) and 8(3) of the Act, 29 U.S.C.A. § 158(1, 3), by interfering with its employees in their organizing efforts and by discharging certain of them for union activities, issued its cease and desist order on April 11, 1941. It now seeks its enforcement. The respondent, denying the jurisdiction of the petitioner over its activities, assails the order on that ground and upon the further ground that there was lack of substantial evidence to support the findings and conclusions of the Board. It therefore prays that the order be set aside.

The facts bearing upon the jurisdictional question are not in controversy. The issue is solely as to their legal effect. The re-

spondent is an Ohio corporation engaged in the production of iron ore in Northern Michigan. In respect to this activity it is concededly engaged in interstate commerce. Neither its mining operations, its labor relations with its miners or with employees in activities integrated with its mining operations, are, however, here involved. Its alleged unfair labor practices are asserted to have been pursued in three lumber camps located near Munising, Michigan, where it was independently engaged in logging operations, and where it employed about 300 men. Its activity there consisted of cutting trees into logs and loading them on cars of an intrastate railroad for delivery to points within the State of Michigan. Of the materials, equipment, and supplies needed by the respondent for its lumbering operations in 1937, approximately 34%, with a value of $44,000, were purchased from without the state. During the same period respondent produced approximately 45½ million board feet of lumber valued at $655,000. Of this approximately 50% was sold and delivered to the Cliffs-Dow Chemical Company of Michigan, in which the respondent owns 34% of the voting stock and is represented upon its Board of Directors. The Cliffs-Dow Chemical Company operates a plant at Marquette, Michigan, where lumber is manufactured into charcoal and chemical products sold largely to customers outside of Michigan. Another 30% of the respondent's timber was shipped to the Piqua-Munising Wood Products Company which at plants in Marquette and Munising, Michigan, manufactures household wooden ware and tool handles sold mainly to outside customers. The respondent owns 74% of its voting stock. This company as a by-product also produces railroad ties, some of which are sold to interstate railroads. The remainder of the respondent's lumber is manufactured by it into railroad ties, and some of it is likewise sold and delivered to interstate railroads.

It is the respondent's contention that the evidence conclusively establishes its lumbering operations to be wholly an intrastate activity, and that as such the business neither is in, nor in any way affects interstate commerce or the flow of goods in such commerce. It points to the fact that all of its timber was grown, cut, transported, and used within the State of Michigan; that such of it as was purchased by the Cliffs-Dow Chemical Com-

pany was processed and converted entirely within the state; that the charcoal and chemicals made by that company were made from commingled wood only part of which came from the respondent's operations; and that it would be impossible to distinguish whether its raw materials were produced by the respondent or by others from whom it made purchases.

The respondent further contends that the evidence shows conclusively that the wood sold to the Piqua-Munising Wood Products Company was processed and converted at the plant of that company at Munising. Although occasionally a carload of wood was shipped by Piqua from Marquette to its Piqua, Ohio, plant, such wood had already been partly processed in the Marquette plant. Both the Chemical Company and the Wood Products Company are separate and distinct entities from the respondent, and neither was wholly dependent upon it for raw materials or upon the continuation of the respondent's logging operations, and other sources of supply were available to them in Michigan. It further points to the fact that prior to the conclusion of the evidence taken in the present case, it had wholly ceased its logging operations, and yet there was neither evidence nor finding that by reason of such cessation either the Chemical Company or the Wood Products Company were in any way curtailed, interfered with, or affected.

It is conceded that approximately 20% of the respondent's timber was manufactured into railroad ties at the respondent's mill at Dixon, Michigan, but these were sold, transported, and delivered wholly within the State of Michigan to three railroad companies, the sole exceptions being two orders of railroad ties delivered at an unspecified time to railroads without the state, and one in 1936 shipped to the Chicago & Great Western Railroad Company which transported it to Minnesota for treatment with creosote. There is, however, no evidence, it contends, that a single tie sold to interstate railroads ever left the State of Michigan except those included in the last mentioned order, and this transaction was concluded long before the occurrence of the alleged unfair labor practices. Of the supplies and equipment which, during 1937, the respondent purchased from without the state, it says that there is no evidence what, if any, portion of it was used in the operation of its

logging camps as distinguished from other operations of its Land Department, although conceding that some were for such use. It is insisted, however, that there is no evidence that such purchases involved the transportation of supplies or equipment into Michigan from without the state, and the orders may have been filled wholly, or in part, from stocks and equipment already in Michigan before the purchases were made. It concedes the sale of $4,000 worth of lumber to purchasers outside the State of Michigan, but insists that there is no evidence to show that this lumber came from the logging camps here under consideration, and in any event it was an isolated sale with nothing to show its recurrence.

The respondent therefore urges it as obvious that if its former logging operations affected interstate commerce to any extent, it did so indirectly and remotely and not in an intimate, close, and substantial way. Before there could be any effect whatever upon interstate commerce there must have been a cutting and loading of timber within the State of Michigan, a delivery of it within the state, a commingling of it with other raw materials, its possible retention in store until required for use, and finally its processing and conversion into other products in which form alone it ever crossed state lines or entered into interstate or foreign commerce.

It is upon this factual narrative that we are called upon to determine the jurisdiction of the Board. In a painstaking and exhaustive analysis of the cases the respondent undertakes to distinguish its activities in relation to commerce from those of employers which, in the more important adjudications, have been held subject to the jurisdiction of the Board. This is not a case, it urges, that involves the furnishing of services or products to concerns which use such services or products, as received, directly in interstate activities, eliminating the application of cases like Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; Consumers Power Co. v. N. L. R. B., 6 Cir., 113 F.2d 38; and N. L. R. B. v. W. H. Kistler Stationery Co., 10 Cir., 122 F.2d 989. It is not a case involving the monopoly of a public utility which furnishes light or power necessary for the operation of plants making goods for interstate sales, again distinguishing it from the Consolidated Edison and Consumers Power

cases; nor a case involving interstate instrumentalities and so eliminating Newport News Shipbuilding & Dry Dock Co. v. N. L. R. B., 4 Cir., 101 F.2d 841, and Virginian R. Co. v. System Federation, 4 Cir., 84 F.2d 641, affirmed 300 U.S. 515, 57 S.Ct. 529, 81 L.Ed. 789; nor a case involving the processing of goods coming into or going out of the plant of the employer in interstate commerce as in N. L. R. B. v. Fainblatt, 306 U.S. 601, 307 U.S. 609, 59 S.Ct. 668, 83 L.Ed. 1014; and N. L. R. B. v. Bradford Dyeing Ass'n., 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226. It is not a case, it says, like Santa Cruz Fruit Packing Co. v. N. L. R. B., 303 U.S. 453, 58 S.Ct. 656, 659, 82 L.Ed. 954, because its home-grown and home-processed products did not go directly from its logging camps into interstate commerce, and its employees were not engaged in loading interstate shipping instrumentalities. And so on.

But if this analysis fails to disclose adjudication of jurisdiction over employees in precisely identical activities, it still does not follow that the respondent is beyond the jurisdiction of the Board if the principles governing decision apply with equal reason to it. It has been held that "the close and intimate effect which brings the subject within the reach of federal power may be due to activities in relation to productive industry, although that industry when separately viewed is local." Santa Cruz Fruit Packing Co., supra; N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 38, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. It is therefore not controlling that the respondent's operations are confined to the state and that its lumber is wholly grown, cut, and delivered to purchasers within the state. In N. L. R. B. v. Fainblatt, supra [306 U.S. 601, 59 S.Ct. 671, 83 L.Ed. 1014], it was said: "It was not any the less interstate commerce because the transportation did not begin or end with the transfer of title of the merchandise transported." Citing Santa Cruz Fruit Packing Co. v. N. L. R. B., supra. Nor is it important that the volume of commerce involved, though substantial, was relatively small either as compared with the rest of respondent's activities or with that in cases previously arising under the Act. The power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small. Hanley v. Kansas City S. R. Co., 187 U.S. 617, 619,

23 S.Ct. 214, 47 L.Ed. 333. There is no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of commerce affected more than that to which courts would apply the maxim de minimis. N. L. R. B. v. Fainblatt, supra.

Nor is there longer any controlling distinction between that which affects commerce directly or that, the effect of which is but indirect. This differentiation is now completely discarded. U. S. v. Wrightwood Dairy Co., 315 U.S. 110, 119, 62 S.Ct. 523, 86 L.Ed. 726; Wickard, Secretary of Agriculture, v. Filburn, 63 S.Ct. 82, 89, 87 L.Ed. —, decided November 9, 1942. In the latter case it was said: "But even if appellant's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'"

We have held that the intervention of a private agency over whom the employer has no authority or control, is of no moment when the effect on commerce would be immediate. Consumers Power Co. v. N. L. R. B., supra; N. L. R. B. v. Alloy Cast Steel Co., 6 Cir., 117 F.2d 302. There remains, however, the question whether a labor controversy in the plant of an employer who produces raw materials wholly grown or mined within the state, is insulated from any effect on interstate commerce by the conversion of such materials into other products by agencies independent of the original producer. This is answered in the negative by N. L. R. B. v. Sunshine Mining Co., 9 Cir., 110 F.2d 780, distinguishing rather than overruling an apparently contrary holding in N. L. R. B. v. Idaho-Maryland Mines Corp., 9 Cir., 98 F.2d 129, 131. It is the effect upon commerce, not the source of the injury which is the criterion. N. L. R. B. v. Jones & Laughlin Steel Corp., supra.

The Board found that industrial strife at respondent's lumber camps would curtail and disrupt the substantial interstate shipments of its two principal customers, and that this was demonstrated in 1937 when a strike at respondent's lumber camps caused the complete shut-down of the Munising plants of the Piqua-Munising Company. It is idle to challenge this finding as unsupported by evidence on the ground that the plants were shut down not by reason of the strike but by reason of the riotous condition prevailing at Munising because of the strike and because the strike was not found to have resulted from unfair labor practices but came as a protest against prevailing wages and alleged unsatisfactory living conditions in the logging camps. It is a distinction without a difference. The National Labor Relations Act, 29 U.S.C.A. § 151 et seq., was intended as a remedial measure to prevent and forestall the impact of labor controversies upon commerce. The close and substantial relationship of the labor situation in respondent's camps to the interstate commerce carried on by its principal customers, was clearly and graphically demonstrated by what occurred in Munising. Curtailment of or interference with interstate commerce is a realistic and not an academic concept.

Finally, we think there is no infirmity in the Board's order because of the fact that before the evidence was closed, the respondent had discontinued its logging operations. The respondent is still in existence. Insofar as we are advised it still owns its timber lands and its logging camps. It has long been the rule that mere discontinuance of an unlawful practice will not relieve the court (or an administrative agency) of the duty to pass upon a pending charge of illegality, when by the mere volition of the parties the illegal practice may be resumed. United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; Southern Pac. Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310; Federal Trade Commission v. Goodyear Tire & Rubber Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326. The order is a continuing one and may be enforced if it is disobeyed. Without deciding whether the broader activities of the respondent in the shipment of ore from its mines in interstate commerce, bring it within the ambit of the National Labor Relations Act, notwithstanding its accused labor practices were in activities not integrated or connected therewith, and without determining whether cessation in delivery of ties to an interstate railroad when no instrumentality of commerce was shown to be involved, affects interstate commerce, we are constrained to conclude

that the impact of labor strife in the defendant's logging operations, upon the flow of goods in commerce, was sufficiently close and substantial to bring the respondent within the purview of the Act and so within the jurisdiction of the Board.

 The Board found respondent guilty of violating §§ 8(1) and 8(3) of the Act by interfering with employees in their organizing efforts, and by discharging certain of their for union activities. Prior to the time nere involved, the lumber camps had not been unionized, but on May 24, 1937, the men voted to join a strike called by Local 2530, an A. F. of L. affiliate. After two weeks respondent agreed to reemploy the strikers and most of them returned to work. Shortly thereafter Cannon, foreman of one of the camps, learned that the union intended to call another strike. He called a meeting of the men, appointed leaders, and had them vote on whether or not they wished to strike. He also had them form a camp committee to attend union meetings. The ostensible purpose of this committee was to recommend improvement in camp conditions, but it might reasonably be inferred that it was also its purpose to seek information as to the plan of the union to call another strike. While this may not have been substantial evidence to support a finding that the respondent sought to form an independent union, it was nevertheless espionage, condemned by the Act, and so an interference with freedom of organization on the part of employees.

 Subsequently the men became dissatisfied with the A. F. of L. union and contemplated changing affiliation to the C. I. O. At a meeting, Fleury, an assistant foreman, advised the men that the company would sign up with the A. F. of L. but would have nothing to do with C. I. O. It would not recognize it because it was of the "Red" element. Later an effort was made to organize the camps on behalf of the Upper Michigan Woodworkers' Association, an unaffiliated organization. The organizer was allowed to come into camp and explain his proposition, and at his request Cannon suggested a man for camp organizer. The man refused and was not discriminated against for such refusal, but some months later another foreman told employee McPherson that the men would have been better off if they had joined the independent union rather than one of the affiliated unions. This may appear insubstantial in support of a finding that the company fostered the independent union, but it supports findings of interference, restraint and coercion of employees in their right to self-organization.

 Congress has entrusted power to draw inferences to the Board and not to the court. N. L. R. B. v. Thompson Products, Inc., 6 Cir., 130 F.2d 363, decided August 28, 1942. In that case we called attention to what was said in International Ass'n of Machinists v. N. L. R. B., 311 U.S. 72, 78, 61 S.Ct. 83, 88, 85 L.Ed. 50, approved in N. L. R. B. v. Link Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368: "Where the employees would have just cause to believe that solicitors professedly for a labor organization were acting for and on behalf of the management, the Board would be justified in concluding that they did not have the complete and unhampered freedom of choice which the Act contemplates." Our analysis of controlling authority leads to the conclusion that the employer must keep his hands off completely and exert no influence over his employees, directly or indirectly, in their efforts to organize for purpose of collective bargaining. This obligation is not met by passive neutrality of management itself. As previously pointed out, it requires that management shall not only preserve its own neutrality but, by effective action, insure the neutrality of supervisory employees and all who undertake to interfere under circumstances where such interference may reasonably be interpreted as the voice of authority. Consumers Power Co. v. N. L. R. B., supra; N. L. R. B. v. Thompson Products, Inc., supra.

 The Board found that seven of the respondent's employees had been discharged for union activity. It would serve no useful purpose to analyze the evidence bearing upon each discharge, at this late date in the consideration of labor controversies. It is sufficient to say that we find substantial evidence to sustain the Board's finding and conclusion in each case except that of McPherson and Bielas, keeping in mind, as we are obliged to do, that the drawing of inferences has been entrusted to the Board. That McPherson was discharged for union activities appears to rest largely upon surmise rather than upon evidence. He absented himself for several days without leave, and while he was active in the strike it does not appear, ex-

cept upon conjecture, that he was relieved of his duties by reason of such activity. Bielas did odd jobs around the camp and was temporarily substituted for an injured sawyer. When the latter returned Bielas was laid off. There is no evidence that his foreman had any knowledge of his union activities.

■ It is contended that the Board's order should not be made to apply to respondent's successors and assigns. In view of the fact that the respondent has discontinued its logging operations, we think this part of the order goes beyond what is reasonably necessary for prevention of unfair labor practices, and becomes plenary. It may well be that this provision will make it difficult or impossible for the respondent to transfer its logging camps to an independent bona fide purchaser. We have no doubt that a merely colorable transfer which is not a true change of ownership would, without the provision, properly raise a question of fact to be resolved by the court if contempt proceedings are instituted. Southport Petroleum Co. v. N. L. R. B., 315 U.S. 100, 62 S.Ct. 452, 86 L.Ed. 718. This was, no doubt, impliedly the view in the Seventh Circuit in cases decided after the Southport decision. N. L. R. B. v. Bachelder, 7 Cir., 125 F.2d 387; N. L. R. B. v. Stone, 7 Cir., 125 F.2d 752. The provision should be eliminated from the order.

■ Respondent also contends that the order is too broad because it requires that it cease and desist from discouraging membership in the C. I. O. *or any other union,* and from interfering *in any other way* with its employees' right to self-organization. There is no evidence that it had discouraged membership in any other union or interfered in any other way with its employees' rights. Notwithstanding tacit approval given by us in North Electric Mfg. Co. v. N. L. R. B., 6 Cir., 123 F.2d 887, to an affirmative order containing directives as general as this, not in this respect assailed, it is undoubtedly the better view that the order should not go beyond the evidence supporting unfair labor practices alleged. N. L. R. B. v. Express Pub. Co., 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed.

930; N. L. R. B. v. American Rolling Mill Co., 6 Cir., 126 F.2d 38, 42; N. L. R. B. v. Thompson Products, Inc., supra.

■ The respondent's contention that the order is in other respects invalid because it has ceased operating its lumber camps, must be rejected. The respondent is still in existence and the order does not require reinstatement of employees except in case it resumes logging operations. Its backpay provisions apply only up to the time the logging camps were shut down. Such an order seems reasonably adapted to the situation which calls for redress. N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381.

Insofar as the respondent claims that the order gives employees, in the event of reinstatement, double pay, because the respondent is required to pay back wages plus maintenance and minus net earnings, its objection is pertinent since it ignores maintenance that might be part of employees' compensation in other camps. While the term "net earnings" might be construed so as to give consideration to maintenance derived in similar employment elsewhere, the provision 2(a) should be clarified by adding to it "such net earnings shall include the reasonable value of any maintenance received in addition to wages during the said period." Section 2(c) of the order, referring to the posting of notices, should also be amended by adding at the end thereof the phrase "or any other union." N. L. R. B. v. Baldwin Locomotive Works, 3 Cir., 128 F.2d 39.

■ The respondent generally complains of the unfairness of the hearing. That there was some evidence of bias on the part of the trial examiner may be granted, but the report was reviewed by the Board and it does not appear that the examiner's errors were prejudicial or that his bias in any way affected final decision. N. L. R. B. v. Ford Motor Co., 6 Cir., 114 F.2d 905.

A decree may be presented amending the Board's order in the respects here indicated, and as so amended it will be enforced.

It is so ordered.