INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, GENERAL DRIVERS AND HELPERS, LOCAL NO. 554, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 13713.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 15, 1958.

Decided Dec. 4, 1958.

1. Cf. Guthrie v. United States, 1953, 92 U.S.App.D.C. 361, 207 F.2d 19.

Mr. Herbert S. Thatcher, Washington, D. C., with whom Mr. Donald M. Murtha, Washington, D. C., was on the brief, for petitioner.

Mr. Norton J. Come, Attorney, National Labor Relations Board, with whom Messrs. Jerome D. Fenton, General Counsel, National Labor Relations Board, Stephen Leonard, Associate General Counsel, National Labor Relations Board, Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, and William W. Watson, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before FAHY, WASHINGTON and BURGER, Circuit Judges.

WASHINGTON, Circuit Judge.

This is a case in which the National Labor Relations Board has found a union guilty of unfair labor practices, and has issued a cease and desist order. The union petitions to set aside the order; the Board seeks enforcement.

█ Beginning in August, 1955, the petitioner union, although not certified, sought recognition as the representative of the employees of Clark Brothers Transfer Company and Coffey's Transfer Company, two motor vehicle common carriers with terminals in Omaha, Nebraska, as a preliminary to obtaining collective bargaining agreements. Clark and Coffey refused recognition and bargaining. The union thereupon called a strike.

From the middle of September until the middle of November 1955 the union not only picketed Clark and Coffey but also picketed the docks of neutral carriers and customers, expressly requesting the employees of the neutral carriers and other employers to refuse to transport or handle Clark and Coffey freight. The union took pictures of secondary employees at the docks in order to make a permanent record of their conduct for possible future action, and instilled in the secondary employees fear of penalties and reprisals for handling Clark and Coffey freight.

Clark and Coffey then filed with the Board charges that the union had committed unfair labor practices under Sections 8(b)(4)(A) and (B) of the National Labor Relations Act.[1] On December 8, 1955, the union entered into settlement agreements with the Board, which required notices to be posted for sixty consecutive days in the union's offices and at the premises of the secondary employers. The notices recited in the statutory language of Sections 8(b)(4)(A) and (B) that the union would not induce or encourage employees of any neutral carrier or other employer to engage in a strike or concerted refusal to handle goods or perform services where the object would be to force or require the neutral carriers or other employers to cease doing business with Clark or Coffey or to force Clark and Coffey to recognize or bargain with the union unless and until the union was properly certified as a bargaining representative. The settlement agreements also required the union to "comply with all the terms and provisions" of the notices. The union posted the notices pursuant to the agreement.

Shortly thereafter, employees began calling the union hall to inquire about the meaning of the notices and whether they should begin to handle Clark and Coffey freight again. Union officials answered all such inquiries by saying either that they could not discuss the matter, or, in cases in which the inquiry concerned the meaning of the notices, that the employees should read the posted notices. Despite the notices, the employees—as the union admits—refused to handle or accept Clark or Coffey freight.

About a month and a half after the settlement agreements, the petitioner union became responsible for a strike called by another local union at the Darling Transfer Company's Kansas City terminal, because Darling had handled Clark and Coffey freight.

One month thereafter representatives of the petitioner union, together with representatives of the Central States Drivers Council, other locals of Teamsters in the State of Nebraska and nonunion carriers in that State, attended a meeting in Omaha, at which a representative of the Council stated the intention of the Council to organize all the carriers in the State of Nebraska.

These actions prompted the Regional Director of the Board to vacate the settlement agreements and to issue a complaint with respect to all of the union's alleged unfair labor practices.[2]

The Trial Examiner, and subsequently the Board, found three separate and distinct unfair labor practices under Sections 8(b)(4)(A) and (B) of the Act: (1) the pre-settlement agreement activities, (2) the union's evasive answers to the phone calls, and (3) the Darling strike. As to the relationship of the union and the Central States Drivers Council in regard to their alleged objective of bringing about a boycott of all non-union carriers in the Omaha area, the Trial Examiner concluded, and the Board agreed, that

"the evidence is too speculative to warrant a finding that Respondent was liable for the * * * conduct. There might be more basis for attributing such conduct to the Central States Drivers Council, which is not a Respondent in this proceeding. However, the evidence does, in my opinion, warrant a cease and desist order broader than that in the usual case. * * * This record demonstrates * * * that, in the future, Respondent's unlawful objective may be directed against other primary employers * * *."[3]

1. Added by 61 Stat. 141 (1947), 29 U.S. C.A. §§ 158(b) (4) (A), (B).

2. Subsequent unfair labor practices allow the Board to go behind the terms of a settlement agreement. Wallace Corp. v. National Labor Relations Board, 1944, 323 U.S. 248, 254–255, 65 S.Ct. 238, 89 L.Ed. 216.

3. International Brotherhood of Teamsters, Local 554, 116 N.L.R.B. 1891, 1913 (1956) (intermediate report); see id. at 1893–94 (decision of the Board).

The Board thereupon issued an order which required the union to post notices for sixty days in the customary places and to notify all its members and all employees of the neutral carriers "that it has no objection to their transporting or handling" Clark or Coffey freight. Furthermore the notices recited that the union would not induce or encourage employees of any neutral employer to do acts where the object would be to force or require any such employer or any other employer or person to cease doing business with Clark, Coffey, "or any other * * * common carrier by motor vehicle in the area over which the * * [union] has jurisdiction," or to force or require Clark, Coffey, "or any other * * * common carrier," to recognize or bargain with the union unless and until the union was properly certified.

The union then petitioned this court to set aside the order of the Board. The Board sought enforcement of its decision and order. The parties stipulated that the findings of fact set forth in the Board's decision and the Trial Examiner's Intermediate Report were supported by substantial evidence on the whole record,[4] and further stipulated four issues for our consideration.

### I.

The first issue stipulated is whether the Board properly concluded that the union's pre-settlement agreement activities were violative of Sections 8(b)(4)(A) and (B),

> "notwithstanding the existence of a clause in said union's collective bargaining agreement with the carriers stating that the carriers' employees shall have the right 'to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other unions.' "

The effect of such a "hot cargo" clause was dealt with by the Supreme Court in Local 1976, United Brotherhood of Carpenters, etc. v. National Labor Relations Board,[5] decided prior to the argument in the present case. The parties agree, and it seems clear to us, that the Carpenters decision is controlling in the present case. Under its authority, the first question posed must be answered in the affirmative, insofar as the hot cargo clause is concerned—and that clause is the only defense the union offers to the charges relative to its activities prior to the settlement agreement.

### II.

The second issue is whether the Board properly concluded that, subsequent to the execution of the settlement agreement and the posting of notices by the union, the union's evasive answers over the telephone in response to the inquiries from union members concerning the meaning of the notices, with no further elaboration, constituted, under the circumstances of the present case, a violation of Sections 8(b)(4)(A) and (B).

In National Labor Relations Board v. Teamsters and Chauffeurs Union, Local 627,[6] the union, pursuant to a settlement agreement, sent along with the required notice and letter another letter informing its members of the terms and conditions upon which it had entered into the settlement agreement and its reasons for having become a party thereto. The Board maintained that the accompanying letter had altered in material and substantial respects the notice and letter required by the decree and destroyed their effectiveness. The court, however, disagreed with the Board's contentions:

> "Certainly there is no statement in the letter which directly contradicts or impinges upon the terms of the decree, and the Board does not so contend, but it argues that by implication such result was produced. We think the position of the Board is picayunish and supported neither by logic nor authority." [7]

4. See id. at 1891, 1897.

5. 1958, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed. 2d 1186.

6. 7 Cir., 1957, 241 F.2d 428.

7. Id. at page 431.

Similarly in the present case the Board takes the position that the evasive answers had violated the settlement agreement, because, although the stated terms of the agreement had been complied with, the union had not taken certain additional affirmative steps necessary to make the notices effective, such as informing the union's members that it was now permissible for them to handle Clark and Coffey freight. The union contests this point and contends that the court should not sustain the Board's order, insofar as it rests on the evasive answers. It maintains that the action of the union officials with respect to the phone calls "constituted full compliance with the Settlement Agreement", that the union was not required to "go out of its way to make the agreement palatable to its members," that "the notices and their posting were all that the Board deemed necessary for enforcement," and that if the Board had "wanted more, it could and should have required it."[8]

The union's contention would perhaps have been persuasive had there been no Darling strike. The Board then would not have been able to go behind the settlement agreement in order to find the pre-settlement conduct an unfair labor practice and thereby treat that prior conduct as background shedding light upon, and imparting meaning to, the evasive answers to the phone calls, for under the Board's practice pre-settlement conduct is never considered unless and until there is found to be a post-settlement violation.[9] Under such circumstances the Board would have been able to consider only the evasive answers and the post-settlement agreement itself. But the finding of the Board with respect to the Darling strike was sufficient in itself to enable the Board to go behind the settlement agreements and find the prior ac-

tivities to have been violations of Sections 8(b)(4)(A) and (B). The Board could then utilize these prior activities as a background to impart meaning to the evasive phone answers. The union admits that the Board order may be sustained on the grounds of the Darling strike and the pre-settlement conduct, but contends that at least this court should not sustain the order on the basis of the evasive answers. Surely, however, the petitioner union cannot mean that there are no circumstances under which the giving of such evasive answers could be found to be an unfair labor practice. The Board did not hold that the evasive answers were *per se* inducement and encouragement within the meaning of the Act; rather it held that *in the context of the union's other activities*, these answers had this effect. Under all the circumstances of the present case, there seems to be adequate support for the Board's position that the evasive answers constituted an unfair labor practice.[10]

We add, however, that if and when a contempt citation is sought for violation of any judicial decree enforcing the Board's order, the court will consider in detail the specific acts of which complaint is made. We need not now pass upon the question of how we would view the union's conduct in a later contempt proceeding should the union ever give such answers again, if that is the sole conduct complained of, since conduct on which contempt is based must, of course, be considered in context and in light of all surrounding circumstances. Cf. United States v. United Mine Workers, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884.[11] It is enough for now that we hold in the present case that the evasive answers in the context of all the union's activities both before and after the set-

8. Brief for Petitioner, p. 15.

9. See National Labor Relations Board v. Hawk & Buck Co., 5 Cir., 1941, 120 F.2d 903, 905; Corn Products Refining Co., 22 N.L.R.B. 824, 828–829 (1940).

10. Cf. Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S.

474, 71 S.Ct. 456, 95 L.Ed. 456; Gray v. Powell, 1941, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301.

11. And see National Labor Relations Board v. Teamsters and Chauffeurs Union, Local 627, 7 Cir., 1957, 241 F.2d 428.

tlement agreement were an unfair labor practice.

### III.

■ The third issue presented to this court is whether the Board has power under Section 10(c) of the National Labor Relations Act [12] to

"issue an order requiring the Union * * * to cease and desist from violating Sections 8(b)(4)(A) and (B), not only as to the primary employers named in the complaint, but also as to all other employers in the area over which the Union has jurisdiction."

On this issue we are bound by the Supreme Court's decision in National Labor Relations Board v. Express Publishing Co.,[13] and this court's implied interpretation of that opinion in Joy Silk Mills, Inc. v. National Labor Relations Board.[14] In the Express Publishing case, the Court found that the authority conferred on the Board by Section 10(c)

"is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct." [15]

■ Even the Trial Examiner and the Board found the evidence too speculative to hold the union liable for any purported state-wide secondary boycotting. True, the Board did find that the evidence warranted a cease and desist order which is broader than is usual; nevertheless, in cases involving such broad orders, the Board not only must make a finding, based upon substantial evidence on the record as a whole, that the blanket order is required,[16] but it also must convince the court that such an order is needed.[17]

We are aware that in National Labor Relations Board v. Sun Tent-Luebbert Co.[18] the Ninth Circuit enforced a broad order in a situation somewhat analogous to that in the present case. In Sun Tent the respondents were employers' associations whose main purpose was to help form company-dominated unions. They set up "educational" programs to "train" employees to deal directly with their employers rather than through outside labor unions. The employers belonging to the associations were determined to make Los Angeles an "open-shop" city and bound themselves not to enter into any agreement with any labor organization. Under such circumstances, there was ample evidence to show that there would have been danger of similar unfair labor practices with respect to other industries in the future. The broad order was therefore warranted.

In the present case, the order is designed to protect not only Clark and Coffey but "all other employers in the area over which the Union has jurisdiction." We think the evidence is quite insufficient to justify such broad coverage. No threat was made to use illegal methods against "all other employers." The basic program was to unionize the area. That sort of program is a major function of the typical union: one of its primary purposes is to organize and become the collective bargaining representative

---

12. 49 Stat. 454 (1935), as amended, 29 U.S.C.A. § 160(c).

13. 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930.

14. 1950, 87 U.S.App.D.C. 360, 373, 185 F. 2d 732, 745, certiorari denied 1951, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350.

15. 312 U.S. at page 433, 61 S.Ct. at page 698.

16. See Id. 312 U.S. at page 434, 61 S.Ct. at page 699.

17. "To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that the danger of their commission in the future is to be anticipated from the course of his conduct in the past. That justification is lacking here. To require it is no more onerous or embarrassing to the Board than to a court." Id., 312 U.S. at page 437, 61 S.Ct. at page 700; see 41 Colum. L.Rev. 910, 911 (1941).

18. 9 Cir., 1945, 151 F.2d 483, certiorari denied sub nom. Merchants & Mf'rs Ass'n of Los Angeles v. National Labor Relations Board, 1946, 329 U.S. 714, 67 S.Ct. 44, 91 L.Ed. 620.

of workers in an industry, and in a particular area. The Act is careful to protect that function and purpose.[19]

We recognize that in National Labor Relations Board v. United Mine Workers[20] the Third Circuit enforced a sweeping order against the United Mine Workers, in spite of its impact on organizing activities. But we believe it more appropriate to follow the reasoning of the Supreme Court in Express Publishing, that a court of appeals should not become a labor court of first instance by virtue of its contempt powers.[21] We therefore, agree with the Sixth Circuit that the better view is "that the order should not go beyond the evidence supporting unfair labor practices alleged."[22] The order of the Board must be modified by limiting its application to Clark and Coffey.

### IV.

█ The final issue stipulated in the present case is—

"whether the Board has authority under Section 10(c) * * * to require the Union not only to post notices notifying its members and other employees that it will not * * * [commit violations of Sections 8(b)(4)(A) and (B)], but also affirmatively * * * [that it will] notify its members and other employees that it has 'no objection' if any such member or employee does handle such freight."

The union contends that this portion of the Board order goes beyond the authority granted in Section 10(c) of the Act, urging that the Board and this court should not and cannot require the union to state something with which it cannot in good conscience basically agree.

The individual employee has a right to make his own independent choice as to whether he will handle or transport Clark and Coffey freight, free from any direct or indirect pressure or "encouragement"

19. One of the chief policies of the National Labor Relations Act is to encourage union organization and collective bargaining. See S.Rep. No. 573, 74th Cong., 1st Sess. 16 (1935). Accordingly, the Act frequently applies different standards to union activity and employer activity. Compare National Labor Relations Act, § 8(a) (1), 49 Stat. 452 (1935), as amended, 29 U.S.C.A. § 158(a) (1), with National Labor Relations Act, § 8(b) (1), added by 61 Stat. 141 (1947), 29 U.S.C.A. § 158(b) (1). Similarly, although the union may use the strike as a weapon against the employer, see National Labor Relations Act, § 13, 49 Stat. 457 (1935), as amended, 29 U.S.C.A. § 163, the Board has held that in single-employer cases, lockouts cannot be used as a weapon against the union; they may only be used to protect against economic loss. See Betts Cadillac Olds, Inc., 96 N.L.R.B. 268 (1951); International Shoe Co., 93 N.L.R.B. 907 (1951); Duluth Bottling Ass'n, 48 N.L.R.B. 1335 (1943). But cf. National Labor Relations Board v. Truck Drivers Local Union No. 449, etc., 1957, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (lockout allowed in multi-employer situation to protect against tactic of "whipsaw" strike).

20. 3 Cir., 1953, 202 F.2d 177.

21. In commenting upon the exclusive jurisdiction provisions of Section 10(a) of the National Labor Relations Act, 49 Stat. 453 (1935), as amended, 29 U.S. C.A. § 160(a), the Court said:
"Congress did not contemplate that the courts should, by contempt proceedings, try alleged violations of the National Labor Relations Act not in controversy and not found by the Board and which are not similar or fairly related to the unfair labor practice which the Board has found." 312 U.S. at page 435, 61 S. Ct. at page 699; and see National Labor Relations Board v. United Mine Workers, 202 F.2d at pages 179, 180, cited supra note 20 (Hastie, J., dissenting).
Since the original conduct against Clark and Coffey is barred by a specific clause, it is obvious that the sole value of the broad order is to serve as a basis for contempt proceedings. Cf. Note, The Scope of NLRB Cease and Desist Orders: Contempt Proceedings Against the Employer, 53 Harv.L.Rev. 472, 479 (1940).

22. National Labor Relations Board v. Cleveland-Cliffs Iron Co., 6 Cir., 1943, 133 F.2d 295, 302; see, e. g., National Labor Relations Board v. Dallas General Drivers, etc., Local 745, 5 Cir., 1956, 228 F.2d 702, 707; National Labor Relations Board v. Youngstown Mines Corp., 8 Cir., 1941, 123 F.2d 178, 181.

by the union. This right could well have been protected by a Board order requiring the union to do various objective acts, rather than requiring it to express a subjective opinion. For example, the Board could have ordered the union to notify its members and other employees that it was withdrawing any instruction, request, or appeal that it had made to stop transporting or handling Clark and Coffey freight.[23] The Board presumably could also have ordered the union to post or mail notices that it would not penalize nor take reprisals against any of its members or any other employees who handled Clark and Coffey freight. And the Board could no doubt have ordered the union to repeat and emphasize these affirmations in answer to any inquiries, by phone or otherwise.

However, the duty of this court is not to decide upon the wisdom of a particular Board order,[24] but rather whether the Board in fact has authority to issue such an order. The present form of order is not without precedent. In National Labor Relations Board v. International Brotherhood of Teamsters, etc., Local 823,[25] the Board, having found that a union had violated Sections 8(b)(1) and (2) of the Act[26] by causing an employer to discharge an employee in violation of Section 8(a)(3),[27] ordered the union not only to request the employer to reinstate the discharged employees, but also to state to the employer that it had "no objection to the reinstatement."[28] The

order was upheld by the Tenth Circuit. Similar orders have been issued in other cases.[29] If a union can be ordered to make such a statement to an employer, surely it can be ordered to make a like statement to its members. We therefore uphold the present order, in view of all the circumstances. It may well be that, upon remand, the Board may wish to reconsider the form of the affirmative portion of its order and order the union to take objective steps rather than state subjective opinions, if it believes such an approach to be more appropriate.

The case is remanded to the Board for such further proceedings as may be consistent with this opinion.[30]

So ordered.

FAHY, Circuit Judge (concurring in part and dissenting in part).

I concur except as to one aspect of the affirmative action required by the order of the Board and discussed in Part IV of the court's opinion. As to this, I think the Board exceeded its authority in requiring the union to include in the notices to be posted a statement to its members and other employees that it has no objection to their handling the freight. The purpose of this provision could be served appropriately, as the court's opinion itself suggests, without requiring the union to include in the notice something that in fact might not be true.

---

23. See General Teamsters, Local 249, 112 N.L.R.B. 311, 313 (1955).

24. Cf. Gray v. Powell, 1941, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301.

25. 10 Cir., 1955, 227 F.2d 439.

26. Added by 61 Stat. 141 (1947), 29 U.S.C.A. §§ 158(b) (1), (2).

27. 49 Stat. 452 (1935), as amended, 29 U.S.C.A. § 158(a) (3).

28. 227 F.2d at page 440.

29. E. g., Technicolor Motion Picture Corp., 115 N.L.R.B. 1607 (1956).

30. National Labor Relations Board v. Dist. 50, United Mine Workers, 1958, 355 U.S. 453, 464, 78 S.Ct. 386, 2 L.Ed.2d 401.