## WALLACE CORPORATION v. NATIONAL LABOR RELATIONS BOARD.

NO. 66.

Argued November 15, 16, 1944.—Decided December 18, 1944.

Mr. *R. Walston Chubb*, with whom *Mr. Lyle M. Allen* was on the brief, for petitioner in No. 66.

Mr. *M. E. Boiarsky*, with whom *Mr. C. S. Rhyne* was on the brief, for petitioner in No. 67.

Mr. *Alvin J. Rockwell*, with whom *Solicitor General Fahy, Messrs. Robert L. Stern, Marcel Mallet-Provost*, and *Miss Ruth Weyand* were on the brief, for respondent.

MR. JUSTICE BLACK delivered the opinion of the Court.

In an attempt to settle a labor dispute at the plant of petitioner company, an agreement approved by the Board was signed by a C. I. O. union, an Independent union, and the company. At a consent election held pursuant to this agreement, Independent won a majority of the votes cast,[1] and was certified by the Board as bargaining representative. The company then signed a union shop contract with Independent, with knowledge—so the Board has found—that Independent intended, by refusing membership to C. I. O. employees, to oust them from their jobs. Independent refused to admit C. I. O. men to membership and the company discharged them.

In a subsequent unfair labor practice proceeding the Board found that (1) Independent had been set up, maintained, and used by the petitioner to frustrate the threatened unionization of its plant by the C. I. O., and (2) the union shop contract was made by the company with knowledge that Independent intended to use the contract as a means of bringing about the discharge of former C. I. O. employees by denying them membership in Independent. The Board held that the conduct of the company in both these instances constituted unfair labor practices. It entered an order requiring petitioner to disestablish Independent, denominated by it a "company union"; to cease and desist from giving effect to the union shop contract between it and Independent; and to reinstate with back pay forty-three employees, found to have been discharged because of their affiliation with the C. I. O., and because of their failure to belong to Independent, as required by the union shop contract.[2] The Circuit Court of Appeals ordered enforcement of the

---

[1] Of 207 eligible employees, 98 voted for Independent, 83 for the C. I. O., and 26 did not vote.

[2] 50 N. L. R. B. 138.

Order.[3]    We granted certiorari because of the importance to the administration of the Act of the questions involved. 322 U. S. 721.

The Board's findings if valid support the entire order. This is so because § 8 (3) of the Act[4] does not permit such a contract to be made between a company and a labor organization which it has "established, maintained, or assisted."[5]    The Board therefore is authorized by the Act to order disestablishment of such unions and to order an employer to renounce such contracts.[6]    Nor can the company, if the Board's findings are well-grounded, defend its discharge of the C. I. O. employees on the ground that the contract with Independent required it to do so.    It is contended that the Board's findings are not supported by substantial evidence.    As shown by its analysis, the Board gave careful consideration to the evidence before it relating to the unfair labor practices which occurred both before and after the settlement agreement and the certification.    The Circuit Court of Appeals unreservedly affirmed the Board's findings, and we find ample substantiating evidence in the record to justify that affirmance.    We need therefore but briefly refer to the circumstances leading to the Board's order.

The findings of the Board establish the fact of an abiding hostility on the part of the company to any recognition of a C. I. O. union.    This hostility we must take it extended to any employee who did or who might affiliate

---

[3] 141 F. 2d 87.

[4] Section 8 (3) contains a proviso to the effect that nothing in the Act "shall preclude an employer from making an agreement with a labor organization (*not established, maintained, or assisted by any action defined in this Act as an unfair labor practice*) to require as a condition of employment membership therein. . . ." (Italics added.)

[5] *Labor Board* v. *Electric Vacuum Cleaner Co.,* 315 U. S. 685, 694.

[6] *I. A. of M.* v. *Labor Board,* 311 U. S. 72, 81–2; *Labor Board* v. *Falk Corp.,* 308 U. S. 453, 461.

252

himself with the C. I. O. union. The company apparently preferred to close down this one of its two plants rather than to bargain collectively with the C. I. O. It publicly proclaimed through one of its foremen that ". . . the ones that did not sign up with the C. I. O. didn't have anything to worry about . . . the company would see that they was taken care of." The settlement agreement plainly implied that the old employees could retain their jobs with the company simply by becoming members of whichever union would win the election. Nevertheless, the company entered into an agreement with Independent which inevitably resulted in bringing about the discharge of a large bloc of C. I. O. men and their president.

The contract was executed after notice to the company by the business manager of Independent that Independent must have the right to refuse membership to old C. I. O. employees who might jeopardize its majority. This business manager, who had himself originally been recommended to Independent by a company employee, wrote the company, prior to the making of the contract, that Independent insisted upon a closed-shop agreement because it wanted a "legal means of disposing of any present employees" who might affect its majority, and "who are unfavorable to our interests." The contract further significantly provided that the company would be released from the clause requiring it to retain in its employ union men only, if Independent should lose its majority and the C. I. O. win it.[7]

Neither the Board nor the court below found that the company engaged in a conspiracy to bring about the dis-

---

[7] The contract reads: "It is mutually agreed by both parties hereto that should the Union at any time become affiliated in any way with any labor organization or federation having membership or local union affiliations in more than one town outside of the City of Richwood, West Virginia, this clause (E) of Article I shall immediately become null and void, . . ."

charge of former C. I. O. members. Both of them, however, have found that the contract was signed with knowledge on the part of the Company that Independent proposed to refuse to admit them to membership and thus accomplish the very same purpose. By the plan carried out the company has been able to achieve that which the Board found was its object from the beginning, namely, to rid itself of C. I. O. members, categorized by its foreman as "agitators."

It is contended that the Board's finding as to company domination has no support in the evidence because the evidence as to company domination antedated the settlement and certification, and hence was improperly admitted. The argument is that the Board cannot go behind the settlement and certification. The petitioner does not argue that any language appearing in the Labor Relations Act denies this power to the Board, but relies upon general principles on which the judicial rule governing estoppel is based. Only recently we had occasion to note that the differences in origin and function between administrative bodies and courts "preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts." *Federal Communications Commission* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 143. With reference to the attempted settlement of disputes, as in the performance of other duties imposed upon it by the Act, the Board has power to fashion its procedure to achieve the Act's purpose to protect employees from unfair labor practices. We cannot, by incorporating the judicial concept of estoppel into its procedure, render the Board powerless to prevent an obvious frustration of the Act's purposes.

To prevent disputes like the one here involved, the Board has from the very beginning encouraged compro-

mises and settlements.[8]  The purpose of such attempted settlements has been to end labor disputes, and so far as possible to extinguish all the elements giving rise to them. The attempted settlement here wholly failed to prevent the wholesale discard of employees as a result of their union affiliations.  The purpose of the settlement was thereby defeated.  Upon this failure, when the Board's further action was properly invoked, it became its duty to take fresh steps to prevent frustration of the Act.  To meet such situations the Board has established as a working rule the principle that it ordinarily will respect the terms of a settlement agreement approved by it.[9]  It has consistently gone behind such agreements, however, where subsequent events have demonstrated that efforts at adjustment have failed to accomplish their purpose, or where there has been a subsequent unfair labor practice.[10]  We

---

[8] Apparently more than 50% of all cases before it have been adjusted under its supervision.  See First Annual Report of the National Labor Relations Board (1936), pp. 30–31; Second Annual Report (1937), pp. 15–17; Third Annual Report (1938), pp. 20–22; Fourth Annual Report (1939), pp. 19–22; Fifth Annual Report (1940), pp. 14, 16–18, 20, 26; Sixth Annual Report (1941), pp. 14–15, 25, 26, 27, 29; Seventh Annual Report (1942), pp. 22–25, 28–30, 80–86; Eighth Annual Report (1943), pp. 20–23, 91, 92.

[9] Matter of Corn Products Refining Co., 22 N. L. R. B. 824, 828–829; Matter of Wickwire Brothers, 16 N. L. R. B. 316, 325–326; Matter of Godchaux Sugars, 12 N. L. R. B. 568, 576–579; Matter of Shenandoah-Dives Mining Co., 11 N. L. R. B. 885, 888; cf. Matter of Locomotive Finished Material Co., 52 N. L. R. B. 922, 927.

[10] Matter of Locomotive Finished Material Co., supra, 926–928; Matter of Chicago Casket Co., 21 N. L. R. B. 235, 252–256; Matter of Harry A. Halff, 16 N. L. R. B. 667, 679–682; cf. Matter of Wickwire Brothers, supra.  The courts have approved the Board's practice in this respect.  Labor Board v. Phillips Gas & Oil Co., 141 F. 2d 304, 305–6 (C. C. A. 3); Labor Board v. Hawk & Buck Co., 120 F. 2d 903, 904–5 (C. C. A. 5); Labor Board v. Thompson Products, 130 F. 2d 363, 366–67 (C. C. A. 6); Canyon Corp. v. Labor Board, 128 F. 2d 953, 955–956 (C. C. A. 8); Sperry Gyroscope Co. v. Labor Board, 129

think this rule adopted by the Board is appropriate to accomplish the Act's purpose with fairness to all concerned. Consequently, since the Board correctly found that there was a subsequent unfair labor practice, it was justified in considering evidence as to petitioner's conduct, both before and after the settlement and certification.

The company denies the existence of a subsequent unfair labor practice. It attacks the Board's conclusion that it was an unfair labor practice to execute the union shop contract with knowledge that Independent at that time intended to deny membership to C. I. O. employees because of their former affiliations with the C. I. O. It admits that had there been no union shop agreement, discharge of employees on account of their membership in the C. I. O. would have been an unlawful discrimination contrary to § 8 (3) of the Act. But the proviso in § 8 (3) permits union shop agreements. It follows therefore, the company argues, that, inasmuch as such agreements contemplate discharge of those who are not members of the contracting union, and inasmuch as the company has no control over admission to union membership, the contract is valid and the company must discharge non-union members, regardless of the union's discriminatory purpose, and the company's knowledge of such purpose. This argument we cannot accept.

The duties of a bargaining agent selected under the terms of the Act extend beyond the mere representation of the interests of its own group members. By its selection as bargaining representative, it has become the agent of all the employees, charged with the responsibility of representing their interests fairly and impartially. Otherwise, employees who are not members of a selected union at the time it is chosen by the majority would be

---

F. 2d 922, 931 (C. C. A. 2). See *Warehousemen's Union* v. *Labor Board*, 121 F. 2d 84, 92–94 (App. D. C.) cert. den. 314 U. S. 674.

left without adequate representation. No employee can be deprived of his employment because of his prior affiliation with any particular union. The Labor Relations Act was designed to wipe out such discrimination in industrial relations. Numerous decisions of this Court dealing with the Act have established beyond doubt that workers shall not be discriminatorily discharged because of their affiliation with a union. We do not construe the provision authorizing a closed shop contract as indicating an intention on the part of Congress to authorize a majority of workers and a company, as in the instant case, to penalize minority groups of workers by depriving them of that full freedom of association and self-organization which it was the prime purpose of the Act to protect for all workers. It was as much a deprivation of the rights of these minority employees for the company discriminatorily to discharge them in collaboration with Independent as it would have been had the company done it alone. To permit it to do so by indirection, through the medium of a "union" of its own creation, would be to sanction a readily contrived mechanism for evasion of the Act.

One final argument remains. The company, it is said, bargained with Independent because it was compelled to do so by law. The union shop contract to which the company at first objected, but into which it entered against the advice of counsel, was the result of that bargaining. The company, it is pointed out, persistently though unsuccessfully sought to persuade Independent to admit C. I. O. workers as members of Independent. Hence, we are told, the company did all in its power to prevent the discharges and should not be held responsible for them. Two answers suggest themselves: First, that the company was not compelled by law to enter into a contract under which it knew that discriminatory discharges of its employees were bound to occur; second, the record discloses that

there was more the company could and should have done to prevent these discriminatory discharges even after the contract was executed. Immediately after the discharge of this large group of employees, the Labor Board complained to the company. The company appealed in writing to Independent's business manager to admit the men to membership, and thus make possible their reinstatement. This appeal was rejected. The Board then called to the company's attention our decision in *Labor Board* v. *Electric Vacuum Cleaner Co.*, 315 U. S. 685, asserting that under its authority the men had been illegally discharged and should be reinstated. In subsequent correspondence, the Board suggested to the company that if it should later be required to reinstate the discharged employees, it would have only itself to blame, since it had voluntarily dispensed with their services. It insisted that the company was taking a needless risk of liability because if the Board should hear charges and dismiss them, the men could then be discharged, but if on the other hand, the Board should sustain the complaint, the discharged employees "would have retained their positions and your client would have no further liability because of their wrongful discharge." The Board's representative at that time wrote the company, "I again beseech you to return them to work pending a decision by the National Labor Relations Board on this question."

It follows from what we have said that we affirm the judgment of the court below approving the order of the Board in its entirety.

*Affirmed.*

MR. JUSTICE JACKSON, dissenting.

A more complete statement of the facts than is found in the Court's opinion is necessary to disclose the reasons why the CHIEF JUSTICE, MR. JUSTICE ROBERTS, MR. JUSTICE FRANKFURTER, and I dissent.

The Wallace Manufacturing Company employs about 200 employees and makes clothespins and similar wood products at Richwood, a small community in West Virginia. In July 1941 a union affiliated with the C. I. O., which after the practice of the Court's opinion we will call the C. I. O., began to organize these employees, and the Company engaged in counter measures. Without detailing the evidence or considering the merits of the Company's objections we will assume that the Company during this period was guilty of unfair labor practices.

On September 25, the C. I. O. called a strike. About October 2, the Independent union, one of the petitioners here, came into being. On October 10, 1941, the C. I. O. filed charges with the Labor Board, alleging among other things that the Company had violated the Act by sponsoring the formation of the Independent. Again, without weighing the evidence or the objections of the Company or of the Independent, we will assume that the Company was guilty.

On October 14, the Independent demanded recognition as bargaining representative of the employees, and on October 31, it filed with the Labor Board a petition for investigation and certification of it as the representative of the Company's employees.

The Board, however, did not proceed on either the complaint or the request for certification. Instead, as the Government states, "During the ensuing two and one-half months, representatives of petitioner [the company], the Board, and the two unions engaged in negotiations looking toward settlement of the entire controversy, including disposition of the Union's charge and the Independent's petition." Again, without considering the Company's or the Independent's objection or evidence, we will assume that during this two and a half months the Company engaged in unfair labor practices. The strike was proceeding, however, with much bitterness and some

violence. On December 30, the strike then being in its fourth month, the C. I. O. by telegram offered, with the approval of the Labor Board, to enter into a consent election "with you and your Company Union, on the condition that when we prove a majority and become the exclusive bargaining agency for all your employees, that as a condition of employment all eligible employees must become members of Local Union 129, U. C. W. O. C." The closed-shop proposal was thus first brought forward by the C. I. O. On January 13, the C. I. O. and the Independent and the Company signed an agreement that the plant should be opened, that everyone should return to work, that the Company would not in any way influence its employees for or against either union, and that the unions would not exercise any coercion. The Company agreed to recognize as exclusive bargaining agent whichever union was proved by a vote conducted by the Board to represent a majority of its employees and to start negotiations immediately after the result of the election was determined and to grant a union shop. All parties are agreed that they employed "union shop" as the equivalent of "closed shop." There is no finding and no evidence that at the time the company entered into this obligation it had any foreknowledge as to which union would win or what the practice of either as to admission of members would be, nor is there any evidence that either union had decided upon any policy in anticipation of victory. There is no charge, no finding, and no evidence that the Company has not performed its part of this agreement scrupulously.

The parties took this agreement to the office of the Board's regional manager and on January 19 two agreements were drawn: one by which the C. I. O. withdrew the charges of domination and other charges; and the other for a consent election to determine the employees' choice of representative. Both of these agreements, after

signature by all the parties, were approved in writing by the Regional Director, acting on behalf of the National Labor Relations Board and with full knowledge of the agreement that the Company would give to the winner a closed shop.[1]

The employees, without distinction as to union affiliation, all returned to work. The election was held January 30, under the auspices of the Board. Of the 186 valid votes cast, the Independent received 98, the C. I. O. 83, and 5 votes were cast for neither. The C. I. O. filed no objections, and the Board on February 4 certified the Independent as the exclusive bargaining agent for the employees in the plant.

Thereupon the Company bargained with the certified representative, as it was required by law to do. The evidence is uncontradicted that the Company was reluctant still to enter into a closed-shop agreement. The Independent, however, insisted that the Company perform the contract by which the strike had been settled. It stated its position in a letter in which it said: "The 'Closed Shop' will, therefore, give us some control in preventing the hiring of additional employees who are unfavorable to our interests and who would further jeopardize our majority. It would also provide us with a legal means of disposing of any present employees, including Harvey Dodrill whom

---

[1] The Board has declared its policy with respect to consent elections as follows: "However, the Board does not ordinarily order elections in the presence of unremedied unfair labor practices, whether merely alleged or already found by the Board, unless the labor organization which instituted the charges has agreed in advance that it will not rely upon the unfair labor practices as a basis for objecting to the conduct or results of the election. The Board orders an election only when it is satisfied, after considering all evidence, respecting the employer's compliance with a prior order concerning unfair labor practices, that 'an election free from all employer compulsions, restraints and interference, can be held.'" Eighth Annual Report (1943) 49.

our members have declared by unanimous ballot that they will not work with, whose presence in the plant is unfavorable to our interests because those who are so unfavorable will not be permitted to become members of our organization and without such membership they would not be permitted to work in the plant under a closed shop contract which we respectfully insist that we *must* have."

This is the first knowledge it is claimed the Company had or should have had of the Independent's adoption of an exclusionary policy toward its rivals. The Company yielded, considering the union's membership policy as something it could not interfere with, and the closed-shop contract was signed. It required that all present and future employees should become members of the Independent within ten days of the date of the contract or from the date of hiring. The contract and notice of the closed-shop arrangement were posted in the plant. On March 18, forty-three employees were dismissed, on demand of the Independent, as not eligible for employment because of non-membership in it. Later it appeared that twelve such dismissed employees never made application for membership in the Independent, and thirty-one members who had applied for membership had been rejected because when their applications came before the meeting in regular course they did not receive the number of ballots necessary under its by-laws to elect to membership. Whether the Company knew that they had applied for membership and had been rejected is disputed, but again we resolve the doubt against the Company and assume that the superintendent knew this fact at the time of discharge.

There is no dispute, however, that when Mr. Wallace, the president of the company, learned of the discharge he attempted to persuade the Independent to allow these employees to be reinstated. On March 20, 1942, he wrote to the business agent of the Independent a letter. The Board has not found that it was not written in good faith.

To the contrary, counsel for the Board with commendable candor stated that there is no evidence and that he made no contention that it was other than a good-faith statement of the Company's position. Among other things it says, "When our Mr. Christmas talked to you on March 9th, you will recall that he appealed to you to see that the closed shop clause, which your Union insisted be included in the working agreement, should not be used in any way to unfairly prevent any person from working who wanted to work. We realize, of course, that the contract does not give the Company the right to tell the Union who to admit as members, and for that reason Mr. Christmas' talk with you and mine over the telephone could only be directed to the sense of fairness which we believe exists in the minds of your members.

"Entirely aside from the fact that having to lay off this large number of experienced people will badly cripple our production which is urgently needed, we feel that it is indeed a sad situation where, account of some individual differences of opinion, people who have perhaps been friends and neighbors for many years cannot work together. I will appreciate your advising me what can be done."

The Regional Director of the Board was notified of the discharges and, as the Court's opinion states, he did urge the Company to disregard its closed-shop contract and re-employ nonmembers of the certified union. The Company's counsel reminded him that he had expressed concern about the closed-shop provision to the Regional Director when it was being negotiated, and that the Director had replied that he probably "would have to agree to it as the C. I. O. certainly would have insisted upon it if they had prevailed in the election." The Company insisted that "membership in the union is beyond the Company's control" and that unless the union relented it would stand by the closed-shop contract. The Company sug-

gested, however, to the Independent that it conduct interviews with those it had rejected and reconsider them individually. The Union by unanimous vote rejected the suggestion. The Regional Director of the Board also wrote to the head of the Independent about the individuals discharged "because they were not members of your union. It develops that your union is unwilling to accept them into membership. I need not remind you of the seriousness of these charges." The Board representatives were unable to persuade the union to accept the rejected members nor the Company to repudiate its agreement.

At the opening of the hearing before the examiner July 9, 1942, the Company declared it was "ready to take any steps which are necessary to the end that these people be put back to work, as it has been throughout, since this agreement was entered into." It suggested that the attorney for the Board and the attorney for the Independent work out a settlement. The Board's attorney expressed "to the representative of the Company my thanks for the suggestion." Adjournment was taken and counsel for the union went from Summerville, the place of hearing, to Richwood and called a meeting of the Independent union. The Board attorney's objection kept further developments out of the record except that he stated, "I am willing to let the record show that Mr. Ritchie [attorney for the Independent] made me a proposition which I was unable to accept and that I made him one which he was unable to accept." The case therefore proceeded against the Company.

The Board did not find any unfair labor practice on the part of the Company between the date of the settlement agreement and the election. In fact, it refused to accept the recommendation of the trial examiner for such a finding, saying that "such interference, if any, was too trivial," was known to the C. I. O., which made no objection to the certification, and had come to the knowledge of the Re-

gional Director prior to the election. "Nevertheless, he proceeded with the election, found it to be a fair one, and certified the Independent."

No unfair labor practices at any time after the settlement agreement are found or charged against the employer except the making and performing of the closed-shop agreement. The Board states its position as follows: "The issue remains whether, by entering into the closed-shop contract with the Independent with knowledge that the Independent intended to exclude employees from membership and by discharging employees denied membership in the Independent, as set forth above, the respondent violated the Act. The respondent contends that it was bound to enter into a closed-shop contract by the terms of the election agreement between the respondent, the Union, and the Independent, and urges the Board to regard the discharges as proper since made pursuant to the closed-shop contract.

"We do not agree. An employer may not enter into a closed-shop contract which to his knowledge is designed to operate as an instrument for effecting discrimination against his employees solely because of their prior union activities. The proviso in Section 8 (3) of the Act permits an employer to enter into an agreement with the duly designated representative of his employees, requiring membership in that organization as a condition of employment. It is true that under the terms of the election agreement the respondent was bound to execute a union-shop contract with the victorious union. It by no means follows, however, that the respondent was also bound by the election agreement to acquiesce in a scheme to penalize employees whose choice of representatives was not that of the majority; nor can the proviso in Section 8 (3) be thought to countenance such a result. . . .

". . . The facts in the case make it apparent that the respondent [Company] was put on notice that its [Inde-

pendent's] real purpose was to bar from future employment with the respondent persons who had adhered to the charging Union in the election campaign. While the tripartite agreement of January 13, 1942, may have been valid when made, performance of its terms did not require the respondent knowingly to become a party to the Independent's plan to eliminate from respondent's pay roll employees solely because of their past union activities. On the contrary, when this unlawful scheme became known to it, the respondent not only had a right to abrogate the tripartite agreement, but also was under an affirmative obligation to do so. . . . Under these circumstances, the closed-shop agreement cannot be deemed a defense, but a discriminatory device to insure perpetuation of the Independent and thus deprive employees of their statutory right to select bargaining representatives."

Holding that execution and performance of the closed-shop agreement after the settlement and certification by the Board were "unfair labor practices," the Board held them effective also to revive the old charges settled by the agreements and election and it went back to those events to find grounds on which to hold that the employer dominates the Independent.

Accordingly it ordered that the Company disestablish and withdraw all recognition from the Independent as representative of any of its employees. It forbade "any continuation, renewal, or modification of the existing contract [which] would perpetuate the conditions which have deprived employees" of their jobs; it ordered the Company to cease giving effect to any contract between it and the Independent or to any modification or extension thereof. It also ordered that the Company "offer the aforesaid 43 employees immediate and full reinstatement to their former or substantially equivalent positions, without prejudice to their seniority or other rights and privileges, and to make them whole for any loss of pay they may have suffered."

The underlying question is, in the language of the Board's brief, "Whether petitioner by entering into and discharging employees pursuant to the terms of the closed-shop contract with the Independent violated Section 8 (3) and (1) of the Act." It is one of importance far beyond this little company and its two hundred employees.

Section 8 (3) makes it an unfair labor practice for an employer, by discrimination, to encourage or discourage membership in any labor organization. If it ended there it would of course outlaw any closed shop, for the very essence of the closed shop is that the employer discriminates in employment to require membership in a particular union. To validate discrimination in such circumstances a proviso follows that no law of the United States "shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees. . . ."

At the time this closed-shop agreement was made the Board had certified the Independent as representative of the employees. Under § 8 it would have been an unfair labor practice had the Company refused to bargain with it. The Board made the certification, without objection by the defeated C. I. O. and with full knowledge that the Company was bound in law and in good faith to give the certified union a closed-shop contract. We do not say, and it is not necessary now to decide, that the Board has no power to protect minorities at this stage of the proceedings. We do not mean to preclude the power of the Board, when the contract settling the strike, withdrawing charges against the company, and consenting to an election with a closed shop to the winner was brought to the Board, to have refused to dismiss charges and undertake an election unless each union agreed that, if it won

a closed shop, it would open the union to membership from the losers on terms the Board deemed fair. Since no one could tell who would win, this would in any event have been an impartial arrangement. Even after the Independent won, the Board before certifying it might perhaps properly have made conditions as to reasonable terms to the defeated. But the Board made no conditions or reservations of the sort. Instead, it takes the position, and the Court is holding, that such conditions must be imposed on the union by the employer. He must see that the union with which he has been ordered to bargain makes proper terms for admission into that certified union of its former enemies and rivals. We think that the decision to that effect is not only unauthorized by Congress, but is utterly at war with the hands-off requirements which the law lays upon the employer, and that this decision is at war with one of the basic purposes of labor in its struggle to obtain this Act and of Congress in enacting it.

Of course the closed shop is well known in labor relations. Its essential philosophy is that once the employees have chosen their representative union, it is entitled to bargain for the employer's help to maintain its control. Other employer aids to a dominant union, such as the check-off, are also conceded to unions by bargaining on behalf of a majority when they would not be at all permissible for the employer to use in the first place to influence the workmen to choose a particular union because he favored it. But the idea of the closed shop is that, while these acts of influence or pressure on workmen are unfair when exerted by the employer in his own interest, they are fair and lawful when enforced by him as an instrument of the union itself. A closed shop is the ultimate goal of most union endeavor, and not a few employers have found it a stabilizer of labor relations by putting out of their shops men who were antagonistic to the dominant union, thus ending strife for domination. It puts the employ-

ment office under a veto of the union, which uses its own membership standards as a basis on which to exclude men from employment.

Neither the National Labor Relations Act nor any other Act of Congress expressly or by implication gives to the Board any power to supervise union membership or to deal with union practices, however unfair they may be to members, to applicants, to minorities, to other unions, or to employers. This may or may not have been a mistake, but it was no oversight. We suppose that there is no right which organized labor of every shade of opinion in other matters would unite more strongly in demanding than the right of each union to control its own admissions to membership. Each union has insisted on its freedom to fix its own qualifications of applicants, to determine the vote by which individual admissions will be granted, to prescribe the initiation or admission fees, to fix the dues, to prescribe the duties to which members must be faithful and to decide when and why they may be expelled or disciplined. The exclusion of those whose loyalty is to a rival union or hostile organization is one of the most common and most understandable of practices, designed to defend the union against undermining, spying, and discord, and possible capture and delivery over to a rival. Some unions have battled to exclude Communists, some racketeers, and all to exclude those deemed disloyal to their purposes. See *Williams* v. *Quill,* 277 N. Y. 1, 7, 12 N. E. 2d 547; *Miller* v. *Ruehl,* 166 Misc. 479, 2 N. Y. S. 2d 394.

There are those who think that the time has come when unions should be denied this control over their own affairs. However this may be, we only know that Congress has included no such principle expressly in the Act. If the Board should attempt to exercise it as we have suggested by way of a condition on its conducting an election or making a certification, a question of its statutory power

to do so might arise, on which we express no opinion. It' would at least be a forthright exercise of power over the unions by the Board itself acting in the public interest and would not require an employer to engage in interference with union affairs in direct violation of the Act.

But the Court is deciding not only that without authority of Congress the admission practices of a labor organization having a closed shop may be policed, but also, contrary as we think to the Act, that the employer is empowered and required to do the policing. This we think defies both the express terms and the philosophy of the Act. The letter of the Act makes it a forbidden practice for an employer to "interfere with" or "restrain" employees in the "right to self-organization." We assume this employer knew the Independent would exercise its power over admission privileges to some extent to protect itself against infiltration of hostile elements. The Board must have known it, too. And both must have known the C. I. O. would, also, if it won. However, the Independent has not indiscriminately excluded all who were against it in the election. The C. I. O. had 83 votes; all but 43 of these voters seem to have been admitted to the Independent, and 12 of those never applied, making 31 apparently rejected. In view of the bitterness and duration of the strike, involving some shooting, it is not strange that good will did not descend on the victors at once. The Board may have expected more moderation when it conducted the consent election and certified the Independent. There is nothing to show that the Company did not, too. When it was found how harshly the Independent had behaved, the Company did try persuasion to get the union leaders to relent—the Company's own interests were to get back more of its experienced employees. How it could have done more without breaking both faith and the law, the Court does not point out, and we do not know.

Of course, if the employer in a closed shop is to be responsible for the discriminations or unfairness of the union, he must have a right to be informed about its admissions. If, in collective bargaining, a union asked a closed shop, the employer would have to demand to know the rules and practices about admission, the fees, the by-laws, the method of electing members. If he should demand this as a condition of collective bargaining, we should expect the Board to hold him guilty of unfair practices, and we have no doubt it would ask this Court to sustain it. Yet here the sole ground of penalizing this employer is that he did not do just that. Should the employer have made the union admit all of its former enemies? If not, by what standard could he allow it to select? Must it also be made to admit even those who would not sign applications or pay initiation fees claimed to be too onerous? The employer is required to reinstate with back pay a dozen who never even asked to join the certified union. But neither the Court nor the Board says what the employer should have required the union to adopt as an admission policy.

The statute expressly permits a closed shop. It can be denied only when the certified union is "established, maintained, or assisted" by unfair labor practices of the employer. But the statute cannot mean that the making and performance of a closed-shop contract in itself is an unfair practice which invalidates a closed shop. To so interpret it would be to believe the Congress by this provision was perpetrating a hoax. But if it means that the union can have a closed shop and the employer will supervise its membership, it is a strange contradiction in an Act whose chief purpose was to sterilize the employers and to free workmen of the influence they exerted through control of the right to work.

We can quite understand, and we do not mean to criticize, the motives which animated the Board. We are deal-

ing here with an industry located in a small community where opportunities for other employment are probably not plentiful. It is not unlikely that denial of the right to work for this company will keep these men from earning a livelihood in a place they long have lived. In so far as the Board has been stirred by concern for individual and minority protection against arbitrary union action, we both understand and sympathize with their concern. The employer is the only one it can lay hands on, and the temptation is great to use him to protect minority rights in the labor movement. This and the other cases before us give ground for belief that the labor movement in the United States is passing into a new phase. The struggle of the unions for recognition and rights to bargain, and of workmen for the right to join without interference, seems to be culminating in a victory for labor forces. We appear now to be entering the phase of struggle to reconcile the rights of individuals and minorities with the power of those who control collective bargaining groups. We have joined in the opinion in *Steele* v. *Louisville & Nashville R. Co., ante,* p. 192. That case arose under the Railway Labor Act, which contains no authorization whatever for a closed shop, on the contrary forbids the discrimination underlying the adoption of a closed shop, and deals with an industry and a labor group which never has had or sought a closed shop. But here we deal with a minority which the statute has subjected to closed-shop practices. Whether the closed shop, with or without the closed union, should or should not be permitted without supervision is in the domain of policy-making, which it is not for this Court to undertake. Neither do we find any authority in the National Labor Relations Board to undertake it.

It happens to be an independent that won here. But counsel for the Board assured us on argument that this is not a one-way policy to require independent unions to admit their enemies. It would, as we understand it,

have been applied in the same manner if the C. I. O. had won and had excluded some Independent members—on suspicion, perhaps, that they were company spies. The obstacle that this decision will interpose to all future bargaining for closed shops is likely to be felt by C. I. O. and A. F. of L. unions many times as often as by independents.

Of course it is the employer who is penalized here, and on shallow and superficial examination it may seem like another victory for labor. The employer must pay many thousands of dollars for hours unworked, because it performed reluctantly but in good faith its closed-shop agreement made under authority of Congress and with knowledge and encouragement of the Board, and with the approval and instigation of the C. I. O. union whose members now gain back pay by its repudiation. We think this cannot be justified as an unfair labor practice outlawed by Congress. That resistance to closed-shop unions will likely be stiffened if employers must underwrite the fairness of closed-shop unions to applicants and members, and that a good deal labor has fought for may be jeopardized if the price of obtaining it is to have the union policed by the employer, are considerations beyond our concern. We can only view this as a very unfair construction of the statute to the employer and one not warranted by anything Congress has directed or authorized.