## OWENS–ILLINOIS GLASS CO. v. NATIONAL LABOR RELATIONS BOARD.

No. 9785.

United States Court of Appeals
Seventh Circuit.

July 15, 1949.

James M. Guiher, Clarksburg, W. Va., Guy Farmer, Washington, D. C., for petitioner.

David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel, Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D. C., for respondent.

Albert K. Plone, Camden, N. J., amicus curiae.

Before MAJOR, Chief Judge, and KERNER and DUFFY, Circuit Judges.

MAJOR, Chief Judge.

This case is here upon petition of Owens-Illinois Glass Company (hereinafter referred to as the company), to review and set aside an order of the National Labor Relations Board (hereinafter referred to as the Board), issued against the company on November 30, 1948, pursuant to Sec. 10(c) of the National Labor Relations Act (hereinafter called the Act), as amended, 61 Stat. 136, 29 U.S.C.A. § 141 et seq. The Board in its answer to the petition requests enforcement of its order.

The case is concerned with the alleged discriminatory discharge of nine of the company's employees,[1] in violation of Sec. 8(3) of the Act. The Board's order directs their reinstatement, with back pay from the date of their asserted unlawful and discriminatory discharge.

The company is located at Alton, Illinois, and early in 1940 a contest was waged between two rival labor organizations, the Glass Bottle Blowers Association, affiliated with the A.F.L. (hereinafter referred to as GBBA), and District 50 of the United Mine Workers (hereinafter referred to as District 50), for the right to represent the employees. A Board election held in 1943 was won by the GBBA but was subsequently set aside by the Board, after proceedings in which the Board found that the company had assisted GBBA and had discouraged membership in District 50. Another election was conducted by the Board on July 10, 1945, in which 601 employees voted for GBBA as against 253 for District 50. The latter union filed objections to the election on the ground that the company had favored GBBA. After a full investigation, however, the Board dismissed the objections as unfounded, and, on August 31, 1945, certified GBBA as the bargaining agent.

Pursuant to the Board's certification, the company and GBBA entered into negotiations, and as a result a collective bargaining agreement was reached and a written contract signed on September 12 retroactive to September 1. This contract included a union-shop provision which required membership in the GBBA as a condition of employment in the plant and affording thirty days for nonmember employees to join the GBBA. The contract further provided that when GBBA notified the company in writing that an employee was not in good standing with GBBA, the company was to be given two weeks from receipt of the notice, and unless within such period the employee had been reinstated in the GBBA, he was to be discharged. On the day following the execution of the agreement, the company posted a notice advising employees that it had signed a union-shop

---

[1] Hockett, Hanold, Rector, Colson, Chessick, Scurlock, Van Meter, Jones and Anton.

contract with GBBA, and the latter posted notices advising employees that applications for membership must be made by September 30.

About September 24, 1945, each of the nine men involved in this case went to the union hall and signed applications for membership in the GBBA. This they were solicited to do by GBBA officials. On October 9 or 10, the nine men again went to the union hall to pay their initiation fees and dues, when they were informed by union officials that they were not going to be permitted to join GBBA. In the meantime, on October 4, Local 222 of GBBA had conducted a meeting for the purpose of considering the applications of all employees who had applied for membership in that union. During the course of the meeting the names of fifty-one employees were submitted to a vote of the membership. A union official placed the name of each applicant on a blackboard in front of the membership. If an objection was made by any member to his admission the name of the applicant was then submitted to vote by a secret ballot, the question being whether or not he would be accepted to membership in the Local. In each instance the question was determined by a majority vote. As a result of the balloting, the Local voted to admit forty-two applicants and to reject the nine men here involved.[2]

Neither the minutes of the meeting nor the testimony offered at the hearing reveals the reason why a majority of the employees voted against the nine discharged men. It is shown that before the vote was taken on each applicant the meeting was thrown open for discussion as to his qualifications. The evidence discloses that no mention was made of the activity of any of them on behalf of District 50, although there was some discussion of the hostile and insulting attitude of some of the nine toward GBBA. One witness testified that the result in each case turned on the personal likes and dislikes of the members participating in the voting. The Board in its brief admits, "The reasons which prompted the local GBBA members to reject these nine applicants were not set forth in the minutes of the meeting and do not appear in the record."

Thereupon, the company was notified by a representative of GBBA that the nine men had been denied membership by a vote of the local union and that the vote was taken in accordance with its constitution and by-laws. A demand was made upon the company for their discharge, in conformity with the union-shop provision of the contract. The company investigated to make certain that the nine men were not in good standing with the union and, being sure that such was the fact, notified each of them that his employment would be terminated as of October 19, 1945, in accordance with the terms of the union-shop agreement. On the employment record of each man the company made the notation that his employment had been terminated because the company had been "advised by the union that he was not in good standing."

There is no dispute but that the discharges were occasioned by the failure of the discharges to acquire membership in the GBBA. It is also unquestioned but that the case arose and was decided under the Wagner Act, which authorized the making and enforcing of closed-shop and union-shop agreements. This Act is in contrast to the Labor Management Act of 1947, which outlaws the closed-shop and substantially restricts the enforcement of the union-shop, but which has no application to this proceeding.

The Board concluded that the discharges were illegal under Sec. 8(a) (3) of the Act, which made it an unfair labor practice for an employer "By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." The company con-

---

2 The procedure followed at the above-described meeting was in strict conformity with Article I, Section 6, of the GBBA constitution, which provides: "No candidate shall be proposed for membership except by a member of this As-sociation in good standing, and no candidate shall be admitted to membership unless a majority of the members at the meeting vote in favor thereof; and if rejected his name shall not again be presented."

tends that the language just quoted is without application because the situation comes squarely within the proviso of such paragraph, which states "That nothing * * * shall preclude an employer from making an agreement with a labor organization * * to require as a condition of employment membership therein, * * * if such labor organization is the representative of the employees * * * in the appropriate collective bargaining unit covered by such agreement when made."

The Board's decision that the proviso legalizing a union shop is of no benefit to the company is predicated upon its findings (1) "that the Respondent's [company's] grant of union-security provisions to the GBBA in the collective contract was made with knowledge that the GBBA intended to penalize former adherents of rival unions by denying the membership in the GBBA," and (2) "that the Respondent [company] had knowledge on and before October 19, 1945, the effective date of the discharge, that the GBBA had specifically requested and was requesting the discharge of [naming all the discharged employees except Anton], because of their membership in and activities on behalf of the UMWA at a time when the UMWA was competing with the GBBA for representatives status."

The first finding, so the Board asserts, brings the case within the rationale of Wallace Corp. v. N. L. R. B., 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216, and renders the contract invalid from its inception, and the second finding brings the case within a doctrine evolved by the Board and referred to as the Rutland Court Doctrine. Matter of Rutland Court Owners, Inc., 44 N. L. R. B. 587. The Board concedes that this doctrine has been disapproved by this court in Aluminum Co. of America v. N. L. R. B., 7 Cir., 159 F.2d 523, and Lewis Meier & Co. v. N. L. R. B., No. 9385, decided from the bench November 3, 1947, without opinion. The second finding, upon which the Board's Rutland Court Doctrine theory is predicated, may therefore be given no more than scant consideration. In fact, the theory therein embodied is not even referred to by the Board in its statement of contested issues and, as stated by the Board, its "primary contention here is that the union shop agreement was void and invalid in its inception, and that this case is therefore controlled by Wallace Corp. v. N. L. R. B., 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216."

As noted, one of the discharged employees, Anton was omitted from the second finding and this for the obvious reason that he was never a member of District 50. He was transferred to Alton from the company's Bridgeton plant on July 23, 1945, where he had been a member of GBBA and upon moving to Alton did not immediately secure a transfer card or become a member of Local 222. At the time of his transfer the election campaign between GBBA and District 50 was over and he, therefore, at no time took any part in the contest between the two unions. It must be accepted as an undisputed fact, therefore, that the vote against his admission to Local 222 of GBBA, at the meeting held on October 4, was for some reason other than that he had been an adherent of a rival union.

While the decision in the Wallace case has been dissected by the parties in their briefs almost line by line, we see no reason to do likewise. Notwithstanding that the rationale of the Wallace case places a heavy, if not unfair, burden upon an employer charged with the duty of bargaining in good faith with a properly certified bargaining agent relative to a union-shop agreement, the holding must be accepted. At the same time, according to our view, its rationale should not be extended beyond the precise situation which the court had before it, and this particularly in view of the emphatic dissenting opinion joined in by four justices of the court.

It is true, as emphasized by the company here, that the court in the Wallace case had before it an extreme situation, wherein it appears that the company and the union deliberately entered into a contract for the express purpose of enabling both the company and the union to accomplish what they both desired, that is, to get rid of certain employees who were members of a rival union. In fact, the union with whom it contracted was a company-dominated union. As the court stated, 323 U.S. at page 256, 65 S.Ct. at page 242, 89 L.Ed. 216: "It

marker174

was as much a deprivation of the rights of these minority employees for the company discriminatorily to discharge them in collaboration with Independent as it would have been had the company done it alone. To permit it to do so by indirection, through the medium of a 'union' of its own creation, would be to sanction a readily-contrived mechanism for evasion of the Act."

■ While the facts in the Wallace case are a far cry from those of the instant case, yet we think the Wallace case stands for the proposition that a contract entered into between a company and a union, with knowledge on the part of the former that it is to be used by the latter as a means of doing away with members of a rival union, is invalid.

This brings us to the critical issue of the instant case as to whether the Board's finding that the contract was entered into by the company "with knowledge that the GBBA intended to penalize former adherents of rival unions by denying them membership in the GBBA" is substantially supported by the record. Before referring to the proof, it is interesting and of some pertinency to note the halting and in some respects inconsistent theories which have been evolved by the Board and its agents since the commencement of the proceedings. As noted, the discharges took place on October 19, 1945, and on October 22, a charge was filed with the Board. However, no complaint was issued until December 3, 1946, more than a year thereafter. During the intervening period, an investigation was conducted by the Board's regional office in St. Louis, and no question was raised as to the existence of a legal union-shop contract, but the only issue under investigation, so the company was advised, was whether it had knowledge that GBBA had used the contract to penalize members of a rival union. At a hearing before a trial examiner, commenced in February, 1947, the Board contended the discharges were illegal because (1) there was no union-shop requirement in the contract, and (2) the company had knowledge that GBBA was using the contract to get rid of members of a competing union. No contention was made that the union-shop provision was illegal. The

examiner in his report filed April 30, 1947, found the discharges illegal solely on the ground that the proof failed to establish the execution of a union-shop contract. The company thereupon sought review by the Board of the examiner's ruling, and in its brief addressed itself to the question of the existence of a union shop, the sole issue decided by the examiner. Therefore, the question of company knowledge, either at the time of the execution of the contract or at the time the employees in question were discharged, was neither raised nor argued before the Board. On November 30, 1948, more than a year and a half after the examiner's report was filed, the Board issued its decision in which it neither adopted nor repudiated the findings and recommendations of the trial examiner that the contract did not contain a union-shop requirement but, as shown, based its decision upon the theory that it was executed and enforced with the company's knowledge of its illegal purpose.

The Board's decision was based on this new and independent ground, notwithstanding the fact that the trial examiner (although urged to do so by counsel for the Board) had refused to find that the contract was unlawfully executed or enforced. More than that, the decision was made by a majority of a three-man panel, one of whom dissented on the ground that the Board had not established knowledge on the part of the company, either at the time the contract was executed or at the time the discharges took place. While this shifting of position on the part of the Board and its representatives, between the time the charge of an unfair labor practice was filed and the Board's final decision, does not impair the authority or the right of the Board to decide as it has, we think this uncertainty and delay has a bearing upon the findings which it has made in support of its decision.

Insofar as shown by its decision, the Board's finding that the company when it agreed to union-shop provision of the contract had "knowledge that the GBBA intended to penalize former adherents of rival unions by denying them membership in the GBBA" is based entirely upon a recorded colloquy introduced in evidence at the hearing, between Martin, representative of the

company, and Black and Clutter, representatives of the GBBA. This colloquy, which we set forth in full in a footnote [3] is, in our judgment, not reasonably susceptible of the inference of knowledge as found by the Board. It appears rather plain from this conversation that the point with which Martin was mostly concerned was whether GBBA could complete within thirty days the task of processing the membership applications of several hundred employees. He was assured by Black that it was the policy of the union not to discriminate. The only statement in this colloquy which might be of any benefit to the Board's finding is the statement of Black, "However, when a local union feels *they have been discriminated against by an individual* they will exercise their right under their constitution and by-laws to refuse membership." Just what was meant by "discriminated against" is not plain, but when considered in connection with the remainder of the colloquy there is no reasonable or logical basis for the inference that the company was put on notice that GBBA proposed or intended to refuse membership to anyone merely because he was or had been a member of a rival union. The rival union was at no time mentioned, and the inference which the Board draws is nothing more than guess or speculation. The Board in its decision did not rely upon Martin's testimony at the hearing in support of its findings, but in its brief professes to find support in such testimony. Without quoting this testimony, it is sufficient that we have read it and think it wholly fails to furnish any support. The very most that can properly be attributed to the company is that they had reason to think that GBBA had the right under its constitution and by-laws to refuse to admit an individual who was obnoxious or, in the language of Black, had "discriminated against" it. But such knowledge, even if it existed, is not the kind of knowledge required to invalidate the contract. In this connection, it is pertinent to note that no attack is made by the Board upon the validity of GBBA's constitution, which required a majority vote of its members in order to gain admission, and it is also pertinent to observe that this was a long-standing provision and not conceived in the instant situation for any ulterior motives.

■ The company was required under the law to bargain with GBBA in good faith as to a union-shop contract. If it had refused to do so because of knowledge that the union might employ its constitutional right to select its own members, the company might have been guilty of an unfair labor practice on the theory that it had re-

---

[3] "Mr. Martin: With respect to the 30-day clause, we have been talking Union Shop Contract. This means *members of rival unions* will have to join your union. Can you take these people in, in the 30-day period provided?

"Mr. Black: Under our by-laws the local union can reject the application of any member. It's not our policy to discriminate. However, when a local union feels *they have been discriminated against by an individual* they will exercise their right under their constitution and by-laws to refuse membership.

"Mr. Martin: We can understand this *in the few cases* but what about the many.

"Mr. Black: We feel people have had two years to decide on what union to join and to promote their union and that any further delay would be superfluous.

"Mr. Black: Reads letter posted by A. C. Budd, Columbus Plant Manager, written to people of Columbus Plant concerning Union. I believe a similar letter written by Mr. Flexon and posted will be most helpful.

"Mr. Martin: Wasn't there a different condition at Columbus; didn't you have some 90% of people sign cards?

"Mr. Clutter: Believe yes.

"Mr. Martin: We are only trying to avoid that about the first of October you wouldn't report to us there were several hundred people who were not in your organization.

"Mr. Clutter: I believe there will only be a very few cases. We believe posting of a notice will aid but we will not let the interest of a few interfere with the desires of the vast majority as expressed in the first election. We will make a sincere effort to complete our solicitations of memberships by October 1.

"Mr. Martin: Do you think you can complete this in 30 days?

"Mr. Black: You bet we can!" (Italics throughout quoted portion supplied by the Board for the purpose, we assume, of emphasizing the particular language upon which it relies.)

fused to bargain in good faith. And we think that even knowledge on the part of the company of the possibility that the union might discriminate against a member of a rival union is insufficient to call for an application of the doctrine enunciated in the Wallace case. It must have knowledge that the union proposes to utilize such a contract as a vehicle to get rid of those of a rival union. This must be so because the inherent nature of a union-shop agreement, as we understand it, is to enable a union not only to select its members but to prevent those who fail to become members from remaining as employees.

■ Not only does the record fail to support the finding of knowledge on the part of the company but it is doubtful if GBBA had any such purpose as attributed to it by the Board, and if it had such purpose, the record affirmatively reveals that it was not carried out. As already noted, there were fifty-one applicants for admission to membership at the October 4 meeting, all presumably former members of District 50, except Anton. Forty-two were admitted and the nine dischargees were refused admission. The very fact that such a large proportion of those belonging to the rival union were admitted strongly suggests that there must have been some other reason for the refusal to admit the nine in controversy and, as already shown, there had to be some other reason as to Anton because he had never been a member of the rival union. The Board concedes that two other of the discharged employees played a minor role in the activities of the rival union, but asserts that "the GBBA was apparently mistaken as to the pro-UMWA activity of these two." More than that, of the forty-two admitted, several had been former officials of District 50, and several of them at least were as prominent in the affairs of that organization as any of those who were refused admission. For instance, there was admitted Julius Klopfer, a former president of the local union of District 50, Lawrence Mugge and William Fessler, who acted as observers along with Hockett and Hanson for District 50 at the second election. Some of those, such as Fessler, De Mundrun and Zimmer, who had previously

been active in the affairs of District 50, were elected as officers in GBBA.

In summation, the GBBA, to whom the Board ascribes the purpose of discriminating against the members of a rival union through a free election, voted in favor of forty-two and against nine, one of whom had never been a member of the rival union and two of whom the Board now concedes were voted against by mistake. It certainly is more reasonable to think—in fact, it is unreasonable to think otherwise—that the nine in question failed to receive a majority because they were personally obnoxious to the membership rather than that they had been active participants in a rival union. The record contains ample evidence, unnoticed by the Board, as to why at least some of the nine men who failed to receive approval were obnoxious. They had day after day characterized the GBBA and its members in the most vile and defamatory terms. The members of Local 222 had an abundance of good reasons for voting to refuse membership to such men and it is unfair to attribute to the Local that they were discriminated against because of their membership in or activities on behalf of a rival union. And again we mention the statement in the Board's brief that the reasons for their rejection "do not appear in the record."

As stated, we conclude and so hold that there is no substantial support for the Board's finding that the company had knowledge at the time the contract in question was executed that it was the purpose of GBBA to discriminate against the members of a rival union. And there is not a scintilla of proof of the company's knowledge at the time the nine men were discharged that they had been refused membership in GBBA because of their activities in a rival union. With a record barren of proof that they were refused membership for such reason, it is unreasonable to think the company had knowledge that such was the purpose.

The petition to review and set aside the Board's order is allowed. The order is vacated and set aside and the Board's request for enforcement is denied.