389 F.2d 721
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
NORTHERN CALIFORNIA DISTRICT COUNCIL OF HOD CARRIERS AND COMMON LABORERS OF AMERICA, AFL-CIO, Construction and General Laborers Union Local No. 185, AFL-CIO, Respondents.
 No. 21569.
 United States Court of Appeals Ninth Circuit.
 January 25, 1968.
 
 Robert M. Lieber, Washington, D. C. (argued), Arnold Ordman, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., N.L.R. B., Washington, D. C., Roy O. Hoffman, Director, N.L.R.B., San Francisco, Cal., for petitioner.
 Charles P. Scully, Donald C. Carroll, San Francisco, Cal., W. Thomas Arruda, Oakland, Cal., Levy, DeRoy, Geffner & Van Bourg, San Francisco, Cal., for respondents.
 Before HAMLIN, DUNIWAY and ELY, Circuit Judges.
 HAMLIN, Circuit Judge.
 
 
 1
 The National Labor Relations Board petitions this court pursuant to section 10 (e) of the National Labor Relations Act (29 U.S.C. § 160(e)) for enforcement of its order issued on September 21, 1965 (reported at 154 N.L.R.B. 1384), against respondents Northern California District Council of Hod Carriers and Common Laborers of America, AFL-CIO, and Construction and General Laborers Union Local No. 185, AFL-CIO. The Board found that respondent Union had violated sections 8(b) (4) (i) and (ii) (B) of the Act, and ordered respondent to cease and desist from these unfair labor practices and to post appropriate notices.
 
 
 2
 The dispute here involved took place at the construction site of a multi-million dollar residential complex at Rocklin, California. Sunset International Petroleum Corporation (Sunset) is the general contractor, but as such had no employees working directly for them. Sunset had entered into a contract with respondent in which it had agreed to hire only unionized sub-contractors (a valid agreement under the proviso to section 8(e) of the Act). Sunset did, however, engage Joseph Mohamed (doing business as Joseph's Landscaping Service), a nonunion sub-contractor, to do various landscaping jobs on the project. Mohamed, in turn, sub-contracted part of his work to King Brothers, a union employer.
 
 
 3
 From February 13, 1963, to March 1, 1963, Mohamed worked without incident on the project. Beginning March 1, however, representatives of respondent came to the construction site and indicated to Mohamed and to Sunset that either Mohamed sign a union agreement or get off the job, or there would be trouble. As a result of these threats a meeting was called for March 5th, and an attempt was made to work out the difficulties. Mohamed was present at this meeting, but did not participate because his counsel failed to show up. Respondent made it clear that if Mohamed was to stay on the job he must sign the respondent's "standard agreement." Mohamed did not, due to the absence of his attorney, make a statement whether or not he would sign, and so the meeting was continued until the following day. By that time Mohamed had consulted with his attorney and had indicated that it was his intention not to sign. Sunset then made it clear that Mohamed would be kept on the job "until such time as the Unions took action wherein there would be delays or curtailments or strikes." Respondent replied, "If that is your position then the Unions will retire and we will take whatever action we deem advisable."
 
 
 4
 The very next day respondent placed pickets at the two major entrances of the construction project. Sunset asked Mohamed to take his men off the job, he did so, and the pickets were removed. As a result of this picketing Mohamed filed an unfair labor practice charge against the respondent. However, the parties subsequently entered into a settlement agreement which was approved by the Regional Director on April 30.
 
 
 5
 On May 7, 1963, respondent resumed its picketing at the two entrances of the construction site. The picketing continued for three days at the two main entrances only, despite the fact that a special entrance had been established for Mohamed and his employees. Finally, in an effort to end this labor trouble, Sunset met with the respondent. Respondent agreed to stop picketing and to let Mohamed complete his job in return for Sunset's reaffirmation of its agreement to hire only union contractors and subcontractors, and its dropping of an unfair labor practice charge it had filed two days earlier.
 
 
 6
 Respondent here alleges that the Board should not have found them to be in violation of the Act for two reasons: (1) The Board improperly considered pre-settlement activity; (2) there is not substantial evidence to support a finding that respondent engaged in any activity which was not directed at the primary employer.
 
 
 7
 DID THE BOARD PROPERLY CONSIDER THE PRE-SETTLEMENT ACTIVITY?
 
 
 8
 Prior to this case, the Board had established a policy that it would not look behind a settlement agreement unless it appeared that there had been a breach of such agreement, or that the unfair labor practices had continued notwithstanding the settlement. The clearest statement of this policy is found in W. Ralston & Co., 131 N.L.R.B. 912, 917 (1961), where the Board said:
 
 
 9
 "It is well settled that continuing violations of the Act will breach a settlement agreement involving unfair labor practices and will justify the Regional Director in vacating the agreement and in proceeding with a complaint which covers unlawful conduct both before and after the agreement. However, findings of unfair labor practice can properly be made on the earlier conduct only where there is evidence of substantial unlawful conduct following the settlement agreement, for evidence of isolated and minor incidents will not justify the Board in going behind the agreement. Moreover, in determining whether independent unfair labor practices have occurred after a settlement, the Board will not appraise a Respondent's subsequent conduct in light of its conduct prior to the settlement."
 
 
 10
 See Eveready Garage, Inc., 126 N.L.R.B. 13 (1960); Larrance Tank Corp., 94 N.L. R.B. 352 (1951); Midwest Piping & Supply Co., 63 N.L.R.B. 1060 (1945).
 
 
 11
 In this case, however, the Board has expressly rejected this policy and held that it will consider pre-settlement activity to establish the "object" of post-settlement conduct. Respondent challenges the wisdom of this policy change. While there may be some merit to respondent's contention that the Board's new policy will discourage parties from settlement of their labor disputes, this appears to be a matter for the Board and not the courts to decide. Respondent cites no authority, and in fact doesn't even assert, that the Board cannot make such a change. Authority supports its right to do so. See NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); International Brotherhood of Operative Potters v. NLRB, 116 U.S.App.D.C. 35, 320 F.2d 757 (1963); NLRB v. A.P.W. Products Co., 316 F.2d 899 (2d Cir. 1963). Congress has reposed in the Board the power to fashion rules governing settlement agreements. 29 C.F.R. §§ 101.7, 101.9 (1967). Quite clearly the procedural effect of such an agreement is within its domain. Moreover, in Wallace Corp. v. NLRB, 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944), the Supreme Court apparently sanctioned the type of decision made by the Board in the instant case. There the question was whether or not the Board could ever consider presettlement activity. The Court said:
 
 
 12
 "It is contended that the Board's finding as to company domination has no support in the evidence because the evidence as to company domination antedated the settlement and certification, and hence was improperly admitted. The argument is that the Board cannot go behind the settlement and certification. The petitioner does not argue that any language appearing in the Labor Relations Act denies this power to the Board, but relies upon general principles on which the judicial rule governing estoppel is based. * * With reference to the attempted settlement of disputes, as in the performance of other duties imposed upon it by the Act, the Board has power to fashion its procedure to achieve the Act's purpose to protect employees from unfair labor practices. We cannot, by incorporating the judicial concept of estoppel into its procedure, render the Board powerless to prevent an obvious frustration of the Act's purposes." 323 U.S. at 253, 65 S.Ct. at 240.
 
 
 13
 Since the Board had the right to change its policy of not considering presettlement activity to determine whether or not there has been a post-settlement violation, it was not error for it to consider respondent's pre-settlement activity in this case.
 
 
 14
 WAS THERE SUBSTANTIAL EVIDENCE TO SUPPORT THE BOARD'S FINDINGS?
 
 
 15
 The respondent's second major contention is that even if the pre-settlement activity is considered there is not substantial evidence to show that the respondent engaged in any activity other than lawful primary activity directed at Mohamed. We disagree.
 
 
 16
 The Board found that respondent had violated section 8(b) (4) of the Act. This section proscribes secondary activity, but by its express proviso allows for primary activity even though such activity may indirectly affect a secondary employer. Thus, the crucial question in this type of case is always to determine the object of the labor activity. E. g., International Brotherhood of Electrical Workers v. NLRB, 341 U.S. 694, 704, 71 S.Ct. 954, 95 L.Ed. 1299 (1951). If it is primary, in other words directed only at the employer with whom the union has a bona fide labor dispute, then it may be lawful even though some neutral or secondary employers might be affected. Conversely, if its object is to bring indirect pressure on the primary employer by involving neutral or secondary employers and their employees, then it may be unlawful.
 
 
 17
 As applied to this case, the Board found that one of the objects of respondent's activity during this period was to put pressure on King and Sunset so that they would either cease doing business with Mohamed, or better still, force him to sign a contract with the union. Respondent, however, argues that the evidence only shows that they were involved in a labor dispute with Mohamed and therefore took proper steps to get him to sign a union contract.
 
 
 18
 To support this position respondent first examines the various statements made by its agents and attempts to show that these statements do not unequivocally show a secondary object. Admittedly, in each instance respondent's interpretation of the statements and actions of the union representatives are plausible. However, the inferences drawn by the Board are clearly more logical, and are ones which are within their expertise to draw. The alternate inferences, therefore do not weaken the substantiality of the evidence as found by the Board.
 
 
 19
 Respondent next argues that the picketing was primary and not secondary in nature in that it complied with the requirements for primary picketing established by the Board in Moore Drydock Co., 92 N.L.R.B. 547 (1950). It would appear that its reliance on this doctrine is misplaced. Moore Drydock does not establish a formula whereby picketing with a secondary object can be done lawfully. Rather it simply establishes as evidentiary aid for the Board to determine the object of picketing where the other evidence is equivocal. The Board is not bound by the inference of lawfulness from compliance with the Moore Drydock standards. Superior Derrick Corp. v. NLRB, 273 F.2d 891, 895-897 (5th Cir. 1960), cert. denied, Seafarers International Union of North America, Atlantic and Gulf Desto, etc. v. NLRB, 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47 (1960); Retail Fruit and Vegetable Clerks Union v. NLRB, 249 F.2d 591, 596-599 (9th Cir. 1957); NLRB v. General Drivers, Warehousemen and Helpers, Local 968, 225 F. 2d 205, 209-210 (5th Cir. 1955), cert. denied, 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801 (1955).
 
 
 20
 The other evidence in this case was far from equivocal. There was first the statements made by the union representatives as discussed above. Moreover, there was the fact that even after being informed that Mohamed and his employees were using a separate entrance to the project, the union continued picketing the main entrances, and most significantly did not picket the separate entrance. Had its object been truly primary it would at least have added a picket at the special gate so that Mohamed's own employees would be informed of the labor dispute with Mohamed. The failure of the respondent to place such a picket is evidence that the primary purpose of the picketing was to pressure Sunset and King.
 
 
 21
 We have reviewed the record and find that there is substantial evidence to support the Board's findings. The Board's order is therefore affirmed and a decree will issue enforcing it.